CA No. 23-1703

# In the
# United States Court of Appeals
# For the Ninth Circuit

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

TRISTON STEINMAN,

Defendant-Appellee.

On Appeal from the United States District Court
for the District of Nevada,

**District Court No.** 3:22-cr-68 (Anne R. Traum, *J.*)

## GOVERNMENT'S OPENING BRIEF

JASON M. FRIERSON
United States Attorney

ROBERT L. ELLMAN
Appellate Chief

PETER H. WALKINGSHAW
Assistant U.S. Attorney
400 S. Virginia St., Ste. 900
Reno, Nevada 89501
(775) 334-3353
peter.walkingshaw@usdoj.gov
*Attorneys for the United States*

Date submitted: March 4, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

I. STATEMENT OF JURISDICTION AND BAIL STATUS ................ 1

II. ISSUES PRESENTED FOR REVIEW .............................. 1

    1. Whether, over the course of 15 minutes, an officer conducting a traffic stop can remove the car's driver, seat him in a patrol car while awaiting proof-of-insurance information, and run a criminal records check while writing the citation, without unconstitutionally prolonging the traffic stop.

    2. Whether a state law enforcement officer had probable cause to search Steinman's car given his admitted possession of ammunition, which violated federal law.

III. STATEMENT OF THE CASE ........................................................ 2

IV. STATEMENT OF THE FACTS ..................................................... 4

V. SUMMARY OF ARGUMENT ......................................................... 9

VI. ARGUMENT .................................................................................. 12

    A. Officer Boyer Took a Reasonable Amount of Time to Conduct the Traffic Stop, Acted Consistently with the Mission of a Traffic Stop, and Had Probable Cause to Search Steinman's Car By the Time of the Search................................................................ 12

        1. Standard of Review........................................................... 12

        2. The District Court Erred in Determining that Trooper Boyer Unconstitutionally Prolonged the Traffic Stop. ................ 12

            a. *Analytical Framework for Prolongation of Traffic Stop.* ... 12

            b. *Boyer Conducted a Lawful, Reasonable Traffic Stop.* ...... 16

    B. Officer Boyer Had Probable Cause to Search Steinman's Car..... 26

1.    Standard of Review....................................................... 26

2.    Analytical Framework for Assessing Probable Cause to Search an Automobile for Contraband............................. 26

3.    Probable Cause Supported the Search of Steinman's Car. . 26

      a.   *Nothing in nevada Law Does Or Could Suggest That the Search Here Violated the Fourth Amendment.* ............... 28

          i.   *Nothing in Nevada Law Prohibits State Police Officers from Investigating Federal Crimes.*............ 29

          ii.   *Federal Law Controls Whether A Search Is Unreasonable and herefore Requires Suppression.* .. 30

      b.   *Officers Had Probable Cause to Search Steinman's Car for Guns.*.................................................................... 34

VII.   CONCLUSION .................................................... 39

VIII.  STATEMENT OF RELATED CASES ............................................. 40

CERTIFICATE OF COMPLIANCE

APPENDIX

# TABLE OF AUTHORITIES

## Federal Cases

*Arizona v. Johnson*, 555 U.S. 323 (2009) ......................................................... 14

*Ashcroft v. Al-Kidd*, 563 U.S. 731 (2011) ....................................................... 17

*California v. Acevedo*, 500 U.S. 565 (1991) ..................................................... 26

*California v. Greenwood*, 486 U.S. 35 (1988) ............................................. 28, 31

*Cooley v. Leung*, 637 F. App'x 1005 (9th Cir. 2016) ..................................... 15

*Cooper v. California*, 386 U.S. 58 (1967) ......................................................... 30

*D.C. v. Wesby*, 583 U.S. 48 (2018) ................................................................. 37

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ....................................................... 26

*Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946 (9th Cir. 2010) ............... 31

*Elkins v. United States*, 364 U.S. 206 (1960) ................................................... 31

*Florida v. Harris*, 568 U.S. 237 (2013) ........................................................... 26

*Gonzales v. Peoria*, 722 F.2d 468 (9th Cir. 1983) ........................................... 30

*Illinois v. Caballes*, 543 U.S. 405 (2005) ......................................................... 14

*Martinez-Medina v. Holder*, 673 F.3d 1029 (9th Cir. 2011) ............................. 31

*Michigan v. Long*, 463 U.S. 1032 (1983) ......................................................... 13

*Ornelas v. United States*, 517 U.S. 690 (1996) ................................................. 26

*Pennsylvania v. Mimms*, 434 U.S. 106 (1997) .................................... 13, 17, 18, 19

*Rodriguez v. United States*, 575 U.S. 348 (2015) ........................................ 12, 13

*United States v. $186, 416.00 in U.S. Currency*,
590 F.3d 942 (9th Cir. 2009) ................................................................. 32, 33

*United State v. Mendez*, 476 F.3d 1077 (9th Cir. 2007) ................................... 21

*United States v. Aruiza-Andrade*, 379 F.Supp.3d 1130 (D. Or. 2019) ............... 16

*United States v. Arvizu*, 534 U.S. 266 (2002) ................................................. 16

*United States v. Baker*, 850 F.2d 1365 (9th Cir. 1988) ..................................... 35

*United States v. Becerra-Garcia*, 397 F.3d 1167 (9th Cir. 2005) ....................... 32

*United States v. Behrens*, 2019 WL 2997775 (D. Idaho July 9, 2019) .............. 22

*United States v. Braddy*, 11 F.4th 1298 (11th Cir. 2021) .................................. 20

*United States v. Brobst*, 558 F.3d 982 (9th Cir. 2009) ...............................28, 31

*United States v. Castro*, 874 F.2d 817 (9th Cir. 1989) ..................................... 32

*United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987) ...................... 31

*United States v. Cole*, 21 F.4th 421 (7th Cir. 2021)......................................... 20

*United States v. Collazo*, 818 F.3d 247 (6th Cir. 2016)...............................15, 21

*United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000) ...........................31, 32

*United States v. Cortez*, 965 F.3d 827 (10th Cir. 2020)................................... 20

*United States v. Dion*, 859 F.3d 114 (1st Cir. 2017)........................................ 21

*United States v. Evans*, 786 F.3d 779 (9th Cir. 2015)...................................... 16

*United States v. Garcia*, 205 F.3d 1182 (9th Cir. 2000) ................................... 22

*United States v. Garner*, 961 F.3d 264 (3d Cir. 2020) ..................................... 20

*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) .................................. 26

*United States v. Gray*, 772 F. App'x 565 (9th Cir. 2019) ................................. 36

*United States v. Horn*, 234 F. App'x 466 (9th Cir. 2007) ................................. 35

*United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022) ......................... 14, 24, 25

*United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030 (D. Mont. 2015)......15, 22

*United States v. Jones*, 438 F. Supp. 3d 1039 (N.D. Cal. 2020) ....................... 32

*United States v. Kash*, 751 F. App'x 1007 (9th Cir. 2018)................................ 22

*United States v. Lawson*, 2016 WL 658796 (N.D. Cal. Feb. 18, 2016)............. 15

*United States v. Malik*, 963 F.3d 1014 (9th Cir. 2020)...................................... 12

*United States v. Miranda-Guerena*, 445 F.3d 1233 (9th Cir. 2006).................... 32

*United States v. Mota*, 982 F.2d 1384 (9th Cir. 1993)...................................... 32

*United States v. Rivera*, 570 F.3d 1009 (8th Cir. 2009) ...............................15, 16

*United States v. Rodgers*, 656 F.3d 1023 (9th Cir. 2011) ................................. 16

*United States v. Sharpe*, 470 U.S. 675 (1985) .................................................. 16

*United States v. Smith*, 899 F.2d 116 (1st Cir. 1990) ....................................... 33

*United States v. Smith*, 952 F.3d 642 (5th Cir. 2020)....................................... 21

*United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992) ........................................ 35

*United States v. Talley*, 467 F. Supp. 3d 832 (N.D. Cal. 2020) ........................ 32

*United States v. Taylor*, 60 F.4th 1233 (9th Cir. 2023)................................14, 25

*United States v. Turvin*, 517 F.3d 1097 (9th Cir. 2008)................................... 15

*United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989)................................. 32

*Virginia v. Moore*, 553 U.S. 164 (2008) ............................................. 28, 30, 32

*Whren v. United States*, 517 U.S. 806 (1996).............................................26, 34

**Federal Statutes**

18 U.S.C. § 922....................................................................................................3

18 U.S.C. § 3231 .................................................................................................1

18 U.S.C. § 3731 .................................................................................................1

26 U.S.C. § 5841 .................................................................................................3

26 U.S.C. § 5861 .................................................................................................3

26 U.S.C. § 5871 ................................................................ 3

28 U.S.C. § 1291 ................................................................ 1

**Federal Rules**

Fed. R. App. P. 32 ........................................................... 41

Ninth Circuit Rule 28-2.7 ................................................. 2

**State Statutes**

NRS § 171.123 ................................................................ 29

NRS § 171.124 ................................................................ 29

NRS § 202.360 .......................................................... 28, 35

NRS § 202.362 ................................................................ 28

NRS § 289.150 ................................................................ 29

# I.

## STATEMENT OF JURISDICTION AND BAIL STATUS

The government appeals the district court's order suppressing evidence 1-ER-2–3, 4–18.[1] The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered the suppression order on July 7, 2023. 1-ER-2–3. The Government filed a timely notice of appeal on August 4, 2023. 3-ER-466. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

The district court ordered Defendant-Appellee Triston Steinman released on a personal recognizance bond with supervision by Pretrial Services. *See* 3-ER-471–472 at ECF Nos. 3, 11.

# II.

## ISSUES PRESENTED FOR REVIEW

1. Whether, over the course of 15 minutes, an officer conducting a traffic stop can remove the car's driver, seat him in a patrol car while awaiting proof-of-insurance information, and run a criminal records check while writing the citation, without unconstitutionally prolonging the traffic stop.

---

[1] "ER" denotes the government's Excerpts of Record preceded by relevant volume number filed with this brief; and "ECF No." denotes the district court's docket. The government has filed a motion to transmit certain exhibits introduced during the hearing to the Court, and that motion is currently pending.

2.    Whether a state law enforcement officer had probable cause to search Steinman's car given his admitted possession of ammunition, which violated federal law.[2]

## III.

## STATEMENT OF THE CASE

*Overview*

This case involves a traffic stop of Defendant Triston Steinman, a felon in possession of 38 firearms, none of which had serial numbers and one of which was loaded and stashed under the driver's seat. A state trooper pulled Steinman over for speeding and, within 15 minutes, knew from plain view and Steinman's own admission that Steinman was carrying ammunition, and knew from a criminal history report that Steinman had felony convictions. Notwithstanding this timeline and additional evidence of crime afoot, the district court granted Steinman's motion to suppress evidence of the guns and ammunition recovered from a warrant search of Steinman's car. The government assigns error in this appeal to the court's holdings that the trooper (1) impermissibly prolonged the stop, and (2) lacked probable cause to search the car.

---

[2]    Under Ninth Circuit Rule 28-2.7, an addendum is not necessary.

*Procedural History*

On March 2, 2023, the federal grand jury in the District of Nevada returned a superseding indictment charging Steinman with felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) (Count One), and possession of unregistered firearms in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Count Two). 3-ER-462.

On April 7, 2023, Steinman filed a motion to suppress, arguing among other things that the state trooper who pulled Steinman over for speeding unlawfully prolonged the traffic stop, 3-ER-303–310, and lacked probable cause to search Steinman's car, 3-ER-310–313. On April 26, 2023, the government filed a timely response rebutting both the prolongation and probable cause arguments. 3-ER-213–225. Steinman filed a reply in support of his suppression motion, 3-ER-186, and the court set the motion for an evidentiary hearing, 3-ER-476 at ECF No. 51.

On July 7, 2023, the district court conducted an evidentiary hearing where Trooper William Boyer, the officer who conducted the traffic stop and vehicle search, testified. 2-ER-23–114. The hearing exhibits included Trooper Boyer's dashcam video (Gov't. Exh. 2) and bodycam video (Gov't. Exh. 3); the arrest/case reports (3-ER-325, 3-ER-353), Trooper Boyer's declaration of probable cause (3-ER-341) and search warrant application (3-ER-344); the

3

transcript of state court preliminary hearing (3-ER-360); and the report on Steinman's criminal history that Boyer received during the stop (3-ER-259).[3] At the conclusion of the hearing, after the parties argued their respective positions, the district court granted the suppression motion from the bench in an oral ruling. 2-ER-170-182; 3-ER-6–18. The court found that "[t]here was a prolonged detention unsupported by reasonable suspicion that far exceeded the scope of a normal traffic stop and mission," and that "[t]here was no probable cause to seize the vehicle." 2-ER-181; 3-ER-17.

The government filed a timely notice of appeal on August 4, 2023. 3-ER-466.

## IV.

## STATEMENT OF THE FACTS[4]

At 3:51 pm on August 12, 2022, Nevada State Trooper William Boyer stopped Steinman's BMW sedan for traveling 89 miles per hour in a 70 mile per hour zone. 2-ER-26–28; *see also* Hearing Exhibit 2 ("Dashcam Video") at 1:07; Hearing Exhibit 3 ("Bodycam Video") at 15:51:17; 3-ER-360 (Justice Court Preliminary Hearing Transcript) at 3-ER-366. Boyer, an experienced

---

[3]     Simultaneously with submission of this brief, the government has filed a motion to transmit copies of the dashcam and bodycam video exhibits.

[4]     For the Court's convenience, a visual timeline of events is appended to this brief as Appendix A.

trooper, had conducted thousands of traffic stops. 2-ER-24, 104. Typically, it takes him approximately 15 minutes to write a traffic citation from the time the driver is stopped until the driver pulls away. 2-ER-104.

After stopping Steinman's car, as the dashcam video shows, Boyer could see Steinman moving around in the car. 2-ER-29; Dashcam Video at 1:03-30. Steinman continued moving as Boyer approached Steinman's passenger window. 2-ER-53; Dashcam Video at 1:03-30; 3-ER-335–336.

When Boyer got to the passenger side door, he told Steinman that he stopped him for speeding. 2-ER-53–54; Dashcam Video at 1:44-47; Bodycam Video at 15:51:55-58. Boyer noticed a blanket spread across the back seat of the car that appeared to be covering items underneath. 2-ER-30; 3-ER-367. He asked Steinman what was under the blanket. 2-ER-53–54; 3-ER-369–370; Dashcam Video at 2:14; Bodycam Video at 15:52:25. Steinman responded that it was "just stuff; just my stuff." Dashcam Video at 2:15-16; Bodycam Video at 15:52:26-27; 3-ER-370. Boyer asked Steinman if there was anything under the blanket that he did not want anyone to see, to which Steinman responded, "No, just my stuff." Dashcam Video at 2:18-20; Bodycam Video at 15:52:29-31.

Officer Boyer also saw an ammunition box on the front passenger floorboard and asked Steinman if he had guns in the car. 2-ER-30; Dashcam

Video at 2:44-46; Bodycam Video at 15:52:54-56; 3-ER-369. Steinman denied having guns in the car—an outright lie—but admitted that he had ammunition. Dashcam Video at 2:47-50; Bodycam Video at 15:52:58-15:53:00; 3-ER-369. That admission occurred less than two minutes into the traffic stop.

Steinman gave Boyer his Washington driver's license and his expired Washington registration, saying he had left his active Utah registration at his house in Utah. Dashcam Video at 2:25-30; Bodycam Video at 15:52:35-40. Boyer then went back to his patrol car to check the status of Steinman's license. Dashcam Video at 2:54-3:15; Bodycam Video at 15:53:04-25.

Officer Boyer returned to Steinman's car to ensure that his VIN number matched the information on his expired registration. Dashcam Video at 5:42-53; Bodycam Video at 15:55:53-15:56:04. Boyer asked for proof of insurance. 3-ER-335; Dashcam Video at 5:48-50; Bodycam Video at 15:55:59-15:56:01. Steinman did not have proof of insurance in his possession at the time, but said that his girlfriend would send a picture of it to his phone. 3-ER-335; Dashcam Video at 6:04-08; Bodycam Video at 15:56:15-19.  At this point, Boyer requested that Steinman step out of his car while they waited to receive the proof of insurance. 3-ER-335; Dashcam Video at 7:10-15; Bodycam Video at 15:57:35-40. Steinman initially declined to do so, but eventually complied and sat in the patrol car with Boyer. 3-ER-335; Dashcam Video at 7:15-8:10;

Bodycam Video at 15:57:25-15:58:20. Despite having the air conditioning on, Boyer noticed that Steinman was sweating heavily. 2-ER-35; Dashcam Video at 13:59-14:02; Bodycam Video at 16:04:10-13; 3-ER-347. Boyer also perceived Steinman as nervous throughout the traffic stop. 3-ER-335–336; 3-ER-347; 3-ER-357.

At 3:59 p.m. – approximately eight minutes after the initial stop, and less than two minutes after entering the patrol car – Steinman received proof of insurance and provided it to Officer Boyer. 3-ER-336; Dashcam Video at 9:03-05; Bodycam Video at 15:59:13-15. Boyer began writing Steinman a citation for speeding. Dashcam Video at 9:32; Bodycam Video at 15:59:42. At 4:02 p.m. – about three minutes into the citation writing process – Boyer requested a criminal history check on Steinman. Dashcam Video at 12:00-02; Bodycam Video at 16:02:11-13. Steinman asked if he was getting a ticket, and Boyer confirmed that he was in the process of issuing him one. Dashcam Video at 12:07-11; Bodycam Video at 16:02:18-22.

At 4:06 p.m. – approximately 15 minutes after the traffic stop began and six and a half minutes into the citation process – Boyer received Steinman's criminal history record, which indicated that Steinman had several felony convictions. Dashcam Video at 16:00; Bodycam Video at 16:06:12. Boyer

reviewed the criminal history information, and continued to work on the traffic citation until he completed it around 4:19 p.m. 2-ER-41.

As Officer Boyer worked on the traffic citation, the two carried on casual conversation. Bodycam Video. at 16:08:00-16:19:30. At one point, Officer Boyer asked Steinman if he had ever been in trouble before, to which he responded, "A little bit. Nothing major though." Bodycam Video at 16:14:55. Steinman explained that he had been charged with assault as a young adult, but said that he did not think that it was a felony. Bodycam Video at 16:15:11. That was another lie: Steinman had a felony conviction for domestic violence with a deadly weapon enhancement. 3-ER-267–268 (Criminal History Report); 2-ER-38–39, 44, 76–77. Boyer also asked Steinman if he still shot guns; Steinman said that he did not, and that he only had the ammunition because someone gave it to him. Bodycam Video at 16:15:28-38.

Upon completing the citation at 4:19 p.m., 2-ER-41, Officer Boyer revealed his knowledge of Steinman's convicted felon status, and asked Steinman for permission to search his car. Bodycam Video at 16:19:53-16:20:03. Steinman refused, telling Boyer, "You're not going to search my car without a warrant," and he recanted his prior statement about possessing ammunition in the vehicle, now saying that the ammunition box was empty. Bodycam Video at 16:20:24-40.

Boyer gave Steinman the traffic citation and returned his driver's license, explaining the process and deadlines related to the citation. Bodycam Video at 16:38:34-55. Boyer then explained to Steinman that he was seizing and impounding Steinman's car pending issuance of the search warrant. Bodycam Video at 15:38:55-15:40:06.

The car was towed. 2-ER-47–48; 3-ER-349; 3-ER-357; 3-ER-372. Boyer applied for and received a warrant to search the car. 2-ER-44–45; 3-ER-357. The search yielded 38 firearms, none of which had serial numbers. 2-ER-45; 3-ER-338–339; 3-ER-356, 357, 359; 3-ER-377; 3-ER-211–212. One of the firearms was a loaded handgun found under the driver's seat. 3-ER-338; 3-ER-372. The search also produced five types of firearm ammunition, seven pounds of marijuana, $12,500 in cash, and drug paraphernalia. 2-ER-45; 3-ER-330–331, 338, 340; 3-ER-356-–357; 3-ER-373, 376.

Police arrested Steinman the day after the traffic stop. 3-ER-356, 358.

## V.

## SUMMARY OF ARGUMENT

The officer in this case conducted a safe and reasonable traffic stop that complied with the constitution. After pulling Steinman over for speeding and observing both an ammunition box in the car and a suspicious mass covered by a blanket in the back seat, Trooper Boyer asked that Steinman exit his car,

placed him in the passenger seat of his patrol vehicle, and made ordinary inquiries as he filled out a citation and waited for the results of a criminal history check. But instead of assessing whether Trooper Boyer's actions were objectively reasonable in pursuing the mission of the stop safely, the district court relied on its perception of Boyer's subjective intentions when taking these actions to hold that the stop was unreasonably prolonged. This was error. As this Court and the Supreme Court have repeatedly held, the relevant concern when assessing the constitutionality of a traffic stop is the objective reasonableness of the officer's actions, not his subjective motivations. And that precedent holds that many of Trooper Boyers actions (such as asking Steinman out of the car and running a check of his criminal history) are *per se* reasonable precautions that an officer may take to conduct a traffic stop safely. Because Boyer diligently pursued the mission of the stop in an objectively reasonable manner, the district court erred in holding that the stop was unreasonably prolonged.

The district court also erred in its holding that the facts did not establish probable cause to search Steinman's car. Once Trooper Boyer received the results of the criminal history check, he knew that Steinman was violating federal law by possessing ammunition, and had probable cause to believe Steinman had a gun in the car in violation of both state and federal law. Yet

10

the district court held that it was unreasonable for Boyer to search Steinman's car because, in its view, (1) state police officers are not permitted to investigate violations of federal law and therefore any search for evidence of federal offenses is unreasonable, and (2) there was no probable cause to search for evidence of a state law violation. The district court erred on both counts. The district court identified no basis for disabling state police officers from investigating federal offenses beyond a perceived, legally unsupported presumption that state law must affirmatively authorize them to do so. But the law holds the exact opposite: local officers are permitted to investigate federal offenses (as evidenced in part by the plethora of criminal cases in federal court that arise from investigations by local police officers), and even state laws forbidding them from doing so do not bear on reasonableness under the Fourth Amendment, which is exclusively a question of federal law. Moreover, even setting aside the federal violation, given Steinman's admitted possession of ammunition, his felony record, and his suspicious actions during the traffic stop, Trooper Boyer had probable cause to search Steinman's car for evidence that he was possessing a gun in violation of state law. The district court erred in granting Steinman's suppression motion, and this Court should reverse.

# VI.

# ARGUMENT

**A.    Officer Boyer Took a Reasonable Amount of Time to Conduct the Traffic Stop, Acted Consistently with the Mission of a Traffic Stop, and Had Probable Cause to Search Steinman's Car By the Time of the Search.**

### 1.    Standard of Review.

This Court reviews the district court's grant of a suppression motion *de novo*, and reviews the factual findings underlying the district court's determination for clear error. *United States v. Malik*, 963 F.3d 1014, 1015 (9th Cir. 2020).

### 2.    The District Court Erred in Determining that Trooper Boyer Unconstitutionally Prolonged the Traffic Stop.

#### a.    *Analytical Framework for Prolongation of Traffic Stops*

The Supreme Court has determined that the "tolerable duration of police inquiries during a traffic stop is to be determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and to attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The Court explained that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Id*. at 355. The Court justified these precautions as

necessary to "ensur[e] that vehicles on the road are operated safely and responsibly" and in the name of officer safety, an interest that "stems from the mission of the stop itself."[5] *Id.* at 355-56. Expanding on this interest, the Court stated that an officer may take "certain negligibly burdensome precautions in order to complete his mission safely," including conducting "criminal record and outstanding warrant checks" or asking the driver to get out of the car. *Id.* at 356-57. Police do not violate the Fourth Amendment unless they "detour from that mission" by conducting an "[o]n-scene investigation into other crimes" without reasonable suspicion – such as by requiring the motorist to wait after the traffic citation has been issued while the officer conducts a dog sniff. *Id.*

---

[5]     The Supreme Court has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1997). Accordingly, once a vehicle has been lawfully detained for a traffic violation, and notwithstanding that officers have no reason to suspect foul play, officers may order individuals out of their vehicles without violating the Fourth Amendment because such conduct is "at most a mere inconvenience" to the motorist and "cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111. The concerns stem primarily from the possibility that, as in Steinman's case, the driver or a passenger has ready access to a hidden, loaded gun. *See Michigan v. Long*, 463 U.S. 1032, 1048 n. 13 (1983) (citing a study which found that "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile").

13

Consistent with these Supreme Court pronouncements, in *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022), this Court joined several other circuits in holding that "because a criminal history check stems from the mission of the stop itself, it is a negligibly burdensome precaution necessary to complete the stop safely." And this Court has since reiterated that "what matters, under *Hylton*, is that conducting a criminal records check in connection with a traffic stop is objectively reasonable." *United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023).

A traffic stop begins "when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). A seizure justified solely by the interest in issuing a traffic ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). But "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333. And the Fourth Amendment does not require officers to conduct their investigation at "top speed;" they may take "brief pauses to ask questions during traffic stops, even if those questions are unrelated to the

14

purpose of the stop...." *See United States v. Turvin*, 517 F.3d 1097, 1102 (9th Cir. 2008).

And a traffic stop that lasts 15 minutes is not, on its face, unreasonably prolonged. *Cooley v. Leung*, 637 F. App'x 1005, 1007 (9th Cir. 2016); *United States v. Lawson*, 2016 WL 658796, at *31 (N.D. Cal. Feb. 18, 2016) ("[E]ven if defendant correctly estimates that the traffic stop lasted 20 minutes up to the search of the car, the interrogation was not unreasonably prolonged"); *United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030, 1035 (D. Mont. 2015) ("the initial seizure and all questioning during the first twenty-seven minutes of the encounter was either necessary to complete the mission of addressing the traffic violation, or did not measurably prolong the stop ..."); *United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009) ("Although Trooper Coleman did ask some questions that were not directly related to the purpose of a traffic stop during the course of the seventeen-minute event, we conclude that Coleman's inquiries did not create an unreasonable seizure"); *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) ("[U]nder the circumstances, the 21 minutes that Hill took to complete the traffic stop was not an unreasonable amount of time").

In assessing whether a traffic stop is prolonged, courts assess the duration of the stop until the point where probable cause exists, which justifies

the balance of the detention. *United States v. Rivera*, 570 F.3d 1009, 1015 (8th Cir. 2009); *United States v. Aruiza-Andrade*, 379 F.Supp.3d 1130, 1137-38 (D. Or. 2019). However, "[a] traffic stop may be extended where unfolding evidence supports a suspicion of criminal activity." *United States v. Rodgers*, 656 F.3d 1023, 1027 (9th Cir. 2011). Prolongation is constitutional "if the prolongation itself is supported by independent reasonable suspicion," which "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). The reasonable suspicion analysis looks "at whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion justifies continued detention until such time as an officer acting diligently can quickly confirm or dispel the suspicion. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

   b.   *Boyer Conducted a Lawful, Reasonable Traffic Stop*

The district court found that Trooper Boyer unreasonably prolonged the traffic stop in three separate instances: when he ordered Steinman out of the car, when the two conversed in Boyer's patrol car while processing the citation, and when Boyer conducted a criminal history check while processing

the citation. 1-ER-6–8; 2-ER-170–172. The district court erred in each instance, examining Boyer's subjective motivations elicited during his testimony rather than applying an objective test as the Fourth Amendment requires.

Boyer Permissibly Removed Steinman from His Car

In the first instance, the district court erred in finding that Officer Boyer unreasonably prolonged the traffic stop when he removed Steinman from his vehicle. The court based this conclusion on Boyer's testimony, finding that Boyer did not order Steinman out of the car for purposes of officer safety, but rather because he wanted to ask Steinman questions. 1-ER-7; 2-ER-171; *see also* 2-ER-68 (Boyer testimony). But even if Boyer was motivated by reasons other than officer safety to order Steinman out of his car, the Fourth Amendment regulates officer conduct objectively, not subjectively. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011). The proper Fourth Amendment inquiry is to "ask whether the circumstances, viewed objectively, justify the challenged action"; if so, then "that action was reasonable whatever the subjective intent motivating the relevant official." *Id.*

Here, Boyer's removal of Steinman was objectively justified and *per se* constitutionally permissible on officer safety grounds. *See Mimms*, 434 U.S. at 110; n. 2, *supra*. The district court therefore erred in treating Steinman's removal from his car as an impermissible prolongation. Indeed, the

17

circumstances that presented themselves to Trooper Boyer illustrate the very danger, recognized in *Mimms* and other cases, that arises when officers conduct a traffic stop: an officer has no way of knowing the temperament or disposition of an individual in a stopped car, or – as here – whether he has a concealed, loaded gun within reach.

On approach, Boyer saw Steinman moving furtively inside the vehicle, but could not discern what Steinman was doing because the rear window was tinted. Bodycam Video. at 15:51:23; Dashcam Video at 1:08-39; 2-ER-29. Boyer noticed a blanket covering items in the back seat, and his eyes then trained on an ammunition box on the floorboard. Bodycam Video at 15:52:24; Dashcam Video at 2:12; 2-ER-30. Steinman twice refused to elaborate on what was under the blanket – implicitly confirming that there were items covered by the blanket but refusing to reveal them. Dashcam Video at 2:10-21; Bodycam Video at 15:52:21-32. Steinman admitted to having ammunition in the box, but volunteered that he did not have guns in the vehicle. Dashcam Video at 2:44-51; Bodycam Video at 15:52:55-15:53:02. Although Boyer asked Steinman to raise his arms to expose his waistband upon exiting the vehicle so that Boyer could visually check for weapons, 2-ER-65–66, that assurance did not extend to items contained in his vehicle, and asking an individual out of a vehicle based on a concern that they may possess a firearm is consistent with

18

the officer-safety rationale countenanced by the Fourth Amendment. *Mimms*, 434 U.S. at 110-11.

The district court concluded that it was "unreasonable" and "odd" from the perspective of officer safety for Boyer to put Steinman unrestrained in the front seat of the police car. 1-ER-7; 2-ER-171. Here, Boyer determined that Steinman did not possess a weapon on his person after asking Steinman to step out of the car, but was still unaware of items possibly hidden in Steinman's vehicle. 2-ER-65–66. Boyer, who had no backup at the scene, had few options. He could allow Steinman to get back into his car and regain access to potentially available weapons; he could expose Steinman to the dangers of highway traffic and the summer sun[6] by having him stand on the side of the road; or he could do what he did, which was to have Steinman wait with him in his air-conditioned patrol car. Boyer's decision was reasonable under these circumstances. Additionally, as a matter of necessity and efficiency, Boyer could not yet begin the citation process because Steinman was still waiting for proof of insurance from his girlfriend. 2-ER-56, 64, 74-75. Ordering Steinman to wait in the patrol car allowed Boyer to begin the citation process as soon as Steinman received proof of his insurance, protected Steinman from the dangers

---

[6]     Steinman was sweating during the traffic stop. 2-ER-35.

of the highway and the heat, and prevented Steinman from accessing hidden weapons in his vehicle.

Boyer Permissibly Talked with Steinman

In the second instance, the district court erred in finding that Boyer's conversation with Steinman in his patrol car unreasonably prolonged the stop because it was not connected to officer safety concerns and distracted Boyer from issuing the citation. 1-ER-7; 2-ER-171. The conversation between Boyer and Steinman in the patrol car did not unreasonably prolong the stop as the questions Boyer posed during the conversation were part of pursuing the stop's mission, and they did not measurably extend the length of the stop given Boyer's simultaneous work on the citation.

Prior to the receipt of Steinman's criminal history, Boyer largely asked about Steinman's travel plans. *See* Bodycam Video at 15:58:00-16:04:00. For instance, Boyer asked Steinman what time he had left Washington that morning and whether he had stopped to rest anywhere. Bodycam 16:03:49-16:03:56. Given the obvious relevance to driver safety, every circuit to consider whether travel-plan questions ordinarily fall within the mission of a traffic stop has held that they do. *See United States v. Cole*, 21 F.4th 421, 430-431 (7th Cir. 2021); *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021); *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020); *United States v. Cortez*, 965

20

F.3d 827, 838-839 (10th Cir. 2020); *United States v. Smith*, 952 F.3d 642, 647-648 (5th Cir. 2020); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017); *Collazo*, 818 F.3d at 257–258. This court should do the same.

Beyond travel-plan related questions, Boyer briefly asked Steinman some questions about his personal background as he completed the citation and awaited the results of the check of Steinman's criminal history. Bodycam Video at 16:04:00-16:07:23. But because Boyer posed those questions while completing the citation, and while awaiting the results of the criminal history check, the questions did not extend the length of Steinman's detention.

Questioning unrelated to the purposes of the traffic stop does not render a stop unlawful unless it prolongs the stop beyond what is necessary to effectuate its purposes. *United State v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). Given Boyer's simultaneous work on the traffic citation and the fact that he was waiting for a result from the criminal history check while posing these questions, none of the questioning measurably extended the stop prior to the receipt of Steinman's criminal history. And again, the district court erred by failing to recognize that, once Boyer knew of Steinman's felon status, Boyer had independent reasonable suspicion (and probable cause) to justify prolonging the stop.

In *United States v. Kash*, 751 F. App'x 1007 (9th Cir. 2018) (unpublished), an officer lawfully pulled over a motorist, who sat in the officer's car and engaged in casual conversation while the officer wrote the citation and ran routine checks. *Kash*, 751 F. App'x at 1010. This conversation led the officer to become suspicious that the defendant was engaged in criminal conduct, but this Court held that that the conversation did not unreasonably prolong the process of issuing the citation. *Id*.; *see also United States v. Garcia*, 205 F.3d 1182, 1187 (9th Cir. 2000) ("Greb testified that it was standard procedure to delay drivers for a short period of time to wait for an arrest report. Thus, Greb's brief conversation with Garcia during this period did not cause any additional delay."); *Iturbe-Gonzalez*, 100 F. Supp. 3d at 1037 ("Iturbe–Gonzalez cannot complain about any of the inquiries posed to him during this period, because these inquiries into unrelated matters did not measurably prolong the stop"); *United States v. Behrens*, 2019 WL 2997775, at *5 (D. Idaho July 9, 2019) (unpublished) ("Without evidence that Officer Burch's questions lengthened the lawful traffic stop in any way, the Court finds these questions did not prolong the stop, and do not make the seizure during the traffic stop unreasonable under the Fourth Amendment").

The panel in *Kash* stated that an officer is not prohibited from asking questions that do not advance the mission of the traffic stop. 751 F. App'x at

1010. Likewise, here, Boyer was "lawfully completing the traffic stop while they conversed," *id.*, as Boyer continued to work on the citation during the conversation; Steinman even asked him questions about the ticket itself, *see* Bodycam Video. at 16:08:00-16:08:30.

<u>Boyer Did Not Unlawfully Prolong the Traffic Stop By Requesting Steinman's Criminal History And Investigating Steinman Based on What He Discovered</u>

In the third instance, the district court erred in ruling that the criminal history check and ensuing investigation unreasonably prolonged the traffic stop. In coming to this conclusion, the district court referenced Boyer's testimony that issuing a citation "normally takes 15 minutes" and stated that the process was "well-exceeded" in this case because Boyer "slow played" the investigation of the traffic citation. 1-ER-11; 2-ER-175. The district court reached that flawed conclusion by assuming that Boyer was not permitted to run a check of Steinman's criminal history and that Boyer's receipt of Steinman's criminal history did not justify further investigation. 1-ER-8; 2-ER-172 (holding the criminal history check impermissible because the district court "d[idn't] agree" that such checks are objectively permissible on officer safety grounds); 1-ER-12; 2-ER-176 (referring to Boyer's investigation after receiving Steinman's criminal history as "clearly untethered to the mission of the stop").

The relevant timeframe for prolongment here is the time elapsed from the beginning of the stop up until the point Boyer received the results of

Steinman's criminal history check at 4:06 p.m., 15 minutes into the stop. At that point, Boyer knew from Steinman's own admissions that Steinman was violating federal felon-in-possession law (which prohibited him from possessing ammunition), and had probable cause to believe Steinman was violating both federal and Nevada felon-in-possession laws (both of which prohibited him from possessing guns). *See infra* at Subsection B.

Boyer stopped Steinman's car at 3:51 pm. He could not begin the citation process until he received valid proof of insurance, but did so as soon as he received that proof from Steinman at 3:59 p.m. Bodycam Video at 15:59:15. He requested the criminal history check at 4:02 p.m., while processing the citation, and received the results three minutes later at 4:06 p.m., before finishing the citation, which he completed at 4:19 p.m.. *Id*. at 16:02:11-16:19:55. He did not pause the citation process to request the criminal history check – the two took place concurrently, and did not delay the overall timeline of the citation. *Id*. The evidence shows that, even with the fact that Steinman was not in possession of all necessary documents to issue a citation at the time of the initial stop, Boyer received Steinman's criminal history by 4:06 p.m., within fifteen minutes of the initial stop. Bodycam Video. at 15:59:15-16:06:12.

The district court's holding that the criminal history check unreasonably prolonged the traffic stop is inconsistent with *Hylton*, where this Court held

24

that "because a criminal history check stems from the mission of the stop itself, it is a negligibly burdensome precaution necessary to complete the stop safely." 30 F.4th at 848 (internal quotation marks and alterations omitted). While the district court attempted to distinguish *Hylton* based on its interpretation of Boyer's subjective intent in running the criminal history check, this Court has reiterated that "what matters, under *Hylton*, is that conducting a criminal records check in connection with a traffic stop is objectively reasonable." *Taylor*, 60 F.4th at 1241.

In finding that the criminal history check was not connected to officer safety, the district court relied heavily on Officer Boyer's testimony that he ran the check for investigatory purposes, rather than for officer safety. 1-ER-8–9; 2-172–173. As discussed above, the Fourth Amendment inquiry is objective, and the district court erred in considering Boyer's subjective intent as a basis to invalidate this objectively reasonable inquiry. Even if Boyer had (at least in part) intended to use the criminal history check to find evidence of other crimes, his subjective intent is irrelevant in assessing whether his conduct was an objectively reasonable part of carrying out the stop safely.

**B.    Officer Boyer Had Probable Cause to Search Steinman's Car.**

**1.    Standard of Review.**

The determination of probable cause is a mixed question of law and fact reviewed de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

**2.    Analytical Framework for Assessing Probable Cause to Search an Automobile for Contraband.**

Probable cause is an objective standard. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Whren v. United States*, 517 U.S. 806, 814 (1996). Probable cause exists if the totality of circumstances suggests a "fair probability" that searching a place will uncover contraband or evidence of a crime. *Florida v. Harris*, 568 U.S. 237, 243-244 (2013). Probable cause does not require certainty, nor does it require a preponderance of the evidence, nor does it require a prima facie showing, it simply requires a fair probability. *United States v. Gourde*, 440 F.3d 1065, 1069, 1073 (9th Cir. 2006) (en banc). If police have probable cause to believe that a lawfully stopped car contains contraband or evidence of a crime, they can conduct a warrantless search of the car. *California v. Acevedo*, 500 U.S. 565, 570-580 (1991).

**3.    Probable Cause Supported the Search of Steinman's Car.**

In holding that Boyer lacked probable cause to search Steinman's car, the district court erred in two respects. First, the district court held that Boyer was not permitted to investigate violations of federal law, and that therefore his

observation of Steinman's ammunition could not provide probable cause to search the car in light of Steinman's status as a felon. Yet the district court identified no state law basis that would preclude Boyer from investigating a federal crime. Even if it had, binding precedent holds that local police are permitted to investigate federal offenses, and reasonableness under the Fourth Amendment is determined without respect to state law. The district court was therefore wrong to disregard Steinman's obvious violation of the federal prohibition on felons possessing ammunition when holding Boyer lacked probable cause.

Second, even setting aside Steinman's violation of federal law as the basis for Boyer's investigation, Boyer had probable cause to search Steinman's car for a violation of Nevada state law prohibiting felons from possessing guns. At the time of the search, Boyer was aware of Steinman's felon status, his admitted possession of ammunition (which has no obvious use beyond being placed in a gun and fired), his furtive movements in the car at the outset of the traffic stop, his obvious violation of a closely-analogous federal law, his nervous demeanor and appearance; and his immediate lies upon being confronted with that violation of federal law. This is more than needed to establish a fair probability that Steinman had a gun in the car. Because Boyer had probable cause to search Steinman's car for violations of both state and

27

federal law, the district court erred in holding he lacked probable cause, and must be reversed.

   a.   *Nothing in Nevada Law Does Or Could Suggest That The Search Here Violated the Fourth Amendment.*

The existence of probable cause of a violation of federal law rendered the search in this case lawful under the Fourth Amendment without regard to Nevada law. As the district court stated, possession of ammunition by a felon is legal under Nevada law. *See* 1-ER-10; 2-ER-174; NRS. § 202.360; cf. *id.* § 202.362 (prohibiting sale or transfer of ammunition to prohibited persons). But no provision of Nevada law expressly forbids state officers from enforcing federal law and, even if it did, the question of whether a search or seizure is reasonable under the Fourth Amendment is a question of federal constitutional law, and does not depend "on the law of the particular State in which the search occurs." *California v. Greenwood*, 486 U.S. 35, 43 (1988); *see Virginia v. Moore*, 553 U.S. 164, 170-76 (2008); *United States v. Brobst*, 558 F.3d 982, 989-90 (9th Cir. 2009). A police search of a felon's car that contains ammunition in plain view, indicating a crime under federal law, is just as constitutional in Nevada as it is elsewhere in the United States. State law does not appear to have limited the officers' authority to conduct the search and, even if it did, it would be irrelevant to the Fourth Amendment analysis.

    *i.*      *Nothing In Nevada Law Prohibits State Peace Officers from Investigating Federal Crimes.*

As a threshold matter, despite holding that Trooper Boyer was not permitted to investigate violations of federal law, the district court identified no provision of Nevada law that prohibits state officers from searching for evidence of a federal crime, and the government has not found one. Under Nevada law, sheriff 's deputies "have the powers of a peace officer." NRS § 289.150. Although Nevada statutory law does not speak clearly to authority to search, "[a]ny peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime." NRS § 171.123. And a peace officer may make a warrantless arrest:

> (a) For a public offense committed or attempted in the officer's presence.
> (b) When a person arrested has committed a felony or gross misdemeanor, although not in the officer's presence.
> (c) When a felony or gross misdemeanor has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it.
> (d) On a charge made, upon a reasonable cause, of the commission of a felony or gross misdemeanor by the person arrested.
> (e) When a warrant has in fact been issued in this State for the arrest of a named or described person for a public offense, and the officer has reasonable cause to believe that the person arrested is the person so named or described.
>
> NRS § 171.124

None of those provisions distinguishes between state and federal offenses, and none purports to deny state officers the authority to enforce federal law, or to search for federal contraband or evidence of federal crimes. Given that the "general rule is that local police are not precluded from enforcing federal statutes," *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), nothing indicates that the officers here violated state law by conducting a search based on probable cause of federal contraband or evidence of a federal crime.

> ii. *Federal Law Controls Whether A Search Is Unreasonable and Therefore Requires Suppression.*

In any event, even if Nevada law prohibited state officers from investigating violations of federal law, the relevant question "is not whether the search was authorized by state law," but "rather whether the search was reasonable under the Fourth Amendment." *Cooper v. California,* 386 U.S. 58, 61 (1967). Whether or not state officers have *state statutory* authority to investigate a federal crime "[does] not alter the content of the Fourth Amendment." *Moore*, 553 U.S. 172. Accordingly, as long as a search comports with the Fourth Amendment, the resulting evidence is not subject to Fourth Amendment suppression even if the search may have violated state law. *See Moore,* 553 U.S. at 172 ("[W]hether or not a search is reasonable within the meaning of the Fourth Amendment  * * *  has never 'depend[ed] on the law of

the particular State in which the search occurs.") (citing *Greenwood*, 486 U.S. at 43); *Elkins v. United States*, 364 U.S. 206, 224 (1960) ("The test [for suppression under the Fourth Amendment] is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.").

This Court has repeatedly recognized and applied this principle. *See, e.g., Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011) (no Fourth Amendment violation where officer seized defendant without authority under Oregon law); *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 956 (9th Cir. 2010) (no Fourth Amendment violation where arrest was improper under California law); *Brobst*, 558 F.3d at 990 (no Fourth Amendment violation regardless of whether seizure complied with Montana law). For example, in *United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987), the Court declined to suppress financial records that state officers had seized in violation of Oregon law. In rejecting Chavez-Vernaza's argument that the records should be excluded because of the state-law violation, this Court was unequivocal: "evidence seized in compliance with federal law is admissible without regard to state law." *Id.* at 1374.

Likewise, in *United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000), this Court rejected Cormier's argument that a violation of state law vitiated his

31

consent to search because "evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law."[7] *Id.* at 1111. *See also United States v. Becerra-Garcia*, 397 F.3d 1167, 1174 (9th Cir. 2005) ("[W]e and several of our sister circuits have declined to consider state law in determining the reasonableness of seizures."); *United States v. Miranda-Guerena*, 445 F.3d 1233, 1238 (9th Cir. 2006) (McKeown, J., concurring) ("[F]ederal law, not Arizona law, is determinative of the admissibility of evidence in this case."); *United States v. Castro*, 874 F.2d 817 (9th Cir. 1989) ("Evidence seized in violation of state law may nevertheless be admitted.").

The district court's reliance on *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942 (9th Cir. 2009), is misplaced.[8] In that forfeiture case,

---

[7]     In two narrow circumstances, this Court has said that federal law affirmatively "requires the incorporation of state law." *Cormier*, 220 F.3d at 1111 (citing *United States v. Mota*, 982 F.2d 1384 (9th Cir. 1993) (searches incident to arrest); *United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989) (inventory searches)). To the extent those decisions have continuing vitality after *Moore*, neither circumstance is implicated here.

[8]     The district court also relied on two district court cases holding that state officers could not establish probable cause for a federal marijuana violation where marijuana was legal under state law. 1-ER-13–14; 2-ER-177–178 (citing *United States v. Talley*, 467 F. Supp. 3d 832 (N.D. Cal. 2020) and *United States v. Jones*, 438 F. Supp. 3d 1039 (N.D. Cal. 2020). However, neither of those two cases addressed the repeated holdings of both the Supreme Court and this

state officers obtained a state warrant to search a medical marijuana dispensary without revealing in the supporting affidavit that the dispensary was permitted to distribute marijuana under state law, and without alleging any violation of federal law. 590 F.3d at 948. This Court held that the state search warrant was not supported by probable cause of a *state* violation because of the affidavit's legal and factual omissions, and was not supported by probable cause of a *federal* violation because the affidavit "never . . . indicated that it was pursuing a violation of federal law." *Id.* at 948. The Court recognized that "there may have been probable cause to search [the dispensary] for a violation of federal law," but the magistrate had not been asked to make that determination. *Id*. Instead, the officers had sought a warrant predicated solely on probable cause of a violation of state law. *See id.*

This Court's invalidation of the resulting warrant in *$186,416.00 in U.S. Currency* does not cast doubt on the correct resolution of this case. The Court did not foreclose the possibility that the state officers could have obtained and executed a warrant to search for evidence of a federal crime if they had

———————————

Court, as cited herein, that reasonableness under the Fourth Amendment is determined without reference to state law. *See also United States v. Smith*, 899 F.2d 116, 118 (1st Cir. 1990) (Breyer, J.) ("[W]e are not aware of any state or federal law that prohibits state police from seizing a weapon, in plain view, that they reasonably believe constitutes evidence of a federal crime").

submitted an affidavit that alleged a federal violation. And in the warrantless-search context, state officers need not "indicate" ex-ante to a neutral magistrate what particular crimes they suspect may have been committed. In fact, it is irrelevant what the state officers here subjectively believed they were investigating. *See Wren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

The facts here comfortably support probable cause to believe that Steinman illegally possessed ammunition in violation of federal law. Boyer observed a box of ammunition in Steinman's car, Steinman himself admitted he possessed the ammunition, and the criminal history check indicated that Steinman had prior felony convictions. The district court erred in holding that the Fourth Amendment prohibited Boyer from investigating further purely on the basis that these facts demonstrated a violation of federal rather than state law. The unreasonableness of that position is self-evident, as Boyer's investigation *led to a federal indictment and prosecution.* The district court's position that violations of federal law are irrelevant to state peace officers is legally unsupportable and plainly wrong. The Court should reverse.

> b.  *Officers Had Probable Cause to Search Steinman's Car for Guns.*

Even if precedent did preclude state officers from basing probable cause on suspicion of a federal violation, the circumstances here nevertheless

34

establish probable cause to search Steinman's vehicle for a violation of Nevada law. Like federal law, Nevada law prohibits the possession of firearms by felons. NRS § 202.360. And this Court has held that the presence of ammunition or other firearm-related items in a car gives rise to probable cause to believe a gun may be in the vehicle. *See United States v. Spencer*, 1 F.3d 742, 745-46 (9th Cir. 1992) (as amended) ("The police were ... justified in believing that a firearm might be in the vehicle after they discovered the shoulder holster underneath the driver's jacket and the officer observed the driver's concealing movements in the automobile after stopping the vehicle"); *United States v. Baker*, 850 F.2d 1365, 1367, 1369 (9th Cir. 1988) (finding probable cause existed to believe that a gun was in a car when motorist had ammunition and magazines on his person after exiting the vehicle); *see also United States v. Horn*, 234 F. App'x 466, 467 (9th Cir. 2007) (unpublished) (finding police had probable cause to search defendant's vehicle where officer observed a bag of bullets, knew defendant was a felon, and defendant made a furtive concealment movement).

Under the totality of the circumstances, the relevant facts here—the ammunition box in Steinman's car, his suspicious movement when Boyer approached the car, his statement that he possessed ammunition, his nervous demeanor, and his prior felony convictions—establish a fair probability that a

35

search of Steinman's car would produce a firearm. *Cf. United States v. Gray*, 772 F. App'x 565, 567 (9th Cir. 2019) (unpublished) (holding that officers' search of defendant's car was supported by probable cause to suspect a violation of Nevada law—smoking marijuana in a moving vehicle— notwithstanding Nevada's legalization of marijuana possession.[9] Here, the district court acknowledged facts supporting the felon-in-possession elements— stating that "[Steinman] had ammunition and was nervous and a felon"—but nonetheless concluded Boyer lacked probable cause to seize the car to search for a firearm. 1-ER-14; 2-ER-178. The district court's only support for its conclusion that the ammunition did not give rise to probable cause to believe the gun was in the car was that the fact that the ammunition was in Steinman's car rather than on his person. 1-ER-11; 2-ER-175. While some of this Court's precedents on the issue involve ammunition found on a suspect's person rather than his car, that is a distinction without a difference, as in each case the ammunition is close at hand and clearly in the suspect's possession. Indeed, the district court offered no support for its conclusory assertion that the presence of ammunition on a person's body suggests a "much greater

---

[9]     In *Gray*, this Court declined to reach the question of whether "the search could be sustained based on a suspected violation of federal law" due to a preservation issue. 772 F. App'x 565 n.2.

likelihood" that a firearm is nearby. Nor could it, as ammunition has little or no intrinsic value beyond being placed in a gun and fired.

The district court also failed to consider that the criminal nature of Steinman's possession of ammunition further supported a finding of probable cause. As discussed above, Steinman's criminal possession of ammunition provided an independent basis to search his car. But even setting that basis for investigation aside, the fact that Steinman was committing a federal gun-related crime during the stop *at a minimum* heightened the likelihood that he was also committing a closely-related state gun crime. In erroneously discounting the significance of the federal law violation, the district court does not appear to have considered this fact at all. Nor did it consider that, when confronted with the federal law violation, Steinman immediately contradicted himself and began lying to Boyer about the ammunition that he had already admitted to possessing. Bodycam Video at 16:20:24-40. That immediate, apparent dishonesty only contributed to the reasonable conclusion that Steinman likely had a gun in the car. *See D.C. v. Wesby*, 583 U.S. 48, 59 (2018) (where officers can "reasonably infer" suspects are lying, they can also infer that the suspect's lies suggest a guilty mind). The district court's failure to consider these facts only compounded its error in concluding that Boyer did not have probable cause to search the car.

The district court was wrong to conclude that (1) the presence of ammunition in Steinman's car, (2) his criminal history, and (3) his suspicious behavior with respect to the car's contents did not give rise to a fair probability that officers would find a gun in a search of the same car. Because the district court's findings establish probable cause, the district court's finding that Boyer lacked probable cause must be reversed.

# VII.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court reverse the district court's order granting Steinman's motion to suppress evidence found in his car.

Dated this 4th day of March, 2024.

JASON M. FRIERSON
United States Attorney

ROBERT L. ELLMAN
Appellate Chief

 s/ *Peter H. Walkingshaw*
PETER H. WALKINGSHAW
Assistant United States Attorney
400 South Virginia St., Suite 900
Reno, NV 89501
(775) 784-5438
*Attorneys for the United States*

# VIII.

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

Dated this 4th day of March, 2024.

s/ *Peter H. Walkingshaw*
PETER H. WALKINGSHAW
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(a)(5), (6) AND CIRCUIT RULE 32-1

I hereby certify that:

Pursuant to Fed. R. App. P. 32(a)(5) and (6) and Ninth Circuit Rule 32-1, the attached **GOVERNMENT'S OPENING BRIEF** is proportionately spaced, has a typeface of 14 points, and contains 8,507 words, excluding the portions exempted by Fed. R. App. P. 32(f).

Dated this 4th day of March 2024.

*s/ Peter H. Walkingshaw*
PETER H. WALKINGSHAW
Assistant United States Attorney

# Government's Appendix

**3:51 p.m. -** Trooper Boyer stops Steinman for speeding. 2-ER-26–28; *see also* Dashcam at 1:07; Bodycam at 15:51:17; 3-ER-346; 3-ER-366.

↓

Boyer sees Steinman moving around in the car as he approaches. 2-ER-29, 53; Dashcam at 1:03-30; 3-ER-335–336.

↓

**3:52 p.m. -** Boyer tells Steinman he stopped him for speeding and asks for registration. 2-ER-53–54; Dashcam at 1:44-47; Bodycam at 15:51:55-58. Boyer sees a blanket covering items in the back seat, 2-ER-30; 3-ER-367, and asks Steinman what it is. 2-ER-53–54; 3-ER-368–379; Dashcam at 2:14; Bodycam at 15:52:25. Steinman says it is "just my stuff." Dashcam at 2:15-16; Bodycam at 15:52:26-27; 3-ER-369.

↓

Boyer sees an ammunition box and asks Steinman if there are guns in the car. 2-ER-30; Dashcam at 2:44-46; Bodycam at 15:52:54-56; 3-ER-368. Steinman denies having guns in the car but admits to having ammunition. Dashcam at 2:47-50; Bodycam at 15:52:58-15:53:00; 3-ER-368.

↓

Steinman gives Boyer his expired driver's license and expired registration, stating his active registration is at his house in Utah. Dashcam at 2:25-30; Bodycam at 15:52:35-40.

**3:55 p.m. -** Boyer returns to his patrol car to run Steinman's license. Dashcam at 2:54-3:15; Bodycam at 15:53:04-25.

↓

Boyer returns, verifies the VIN number, and asks for proof of insurance. Dashcam at 5:42-53 and 5:48-50; Bodycam at 15:55:53-15:56:04 and 15:55:59-15:56:01; 3-ER-335.

↓

Steinman says he doesn't have his insurance, and his girlfriend will send it to him. 3-ER-335; Dashcam at 6:04-08; Bodycam at 15:56:15-19.

↓

**3:57 p.m. -** Boyer asks Steinman to step out of the car, 3-ER-335, Dashcam at 7:10-15, Bodycam at 15:57:35-40, Steinman eventually agrees and waits in the patrol car with Boyer. 3-ER-335, Dashcam at 7:15-8:10; Bodycam at 15:57:25-15:58:20.

↓

Steinman was sweating and overly nervous during the traffic stop. 2-ER-35; Dashacm at 13:59-14:02; Bodycam at 16:04:10-13; 3-ER-348; 3-ER-335–336; 3-ER-357.

↓

**3:59 p.m. -** Steinman gives Boyer proof of insurance. 3-ER-336; Dashcam at 9:03-05; Bodycam at 15:59:13-15. Boyer begins writing Steinman a ticket for speeding. Dashcam at 9:32; Bodycam at 15:59:42.

**4:02 p.m. -** Boyer requests a criminal historu check on Steinman. Dashcam at 12:00-02; Bodycam at 16:02:11-13.

**4:06 p.m. -** Boyer learns that Steinman has several felonies on his record. Dashcam at 16:00; Bodycam at 16:06:12.

**4:09 p.m. - 4:14 p.m. -** Boyer and Steinman engage in casual conversation. Bodycam at 16:08:00-16:19:30.

**4:14 p.m. -** Boyer asks Steinman if he has ever been in trouble and Steinman denies any felony convictions. Bodycam at 16:14:55 and 16:15:11. Boyer asks Steinman if he still shoots guns, Steinman says no, and that the ammunition was given to him. Bodycam at 16:15:28-38.

**4:15 p.m. - 4:19 p.m. -** Boyer continues completing the traffic citation, informs Steinman of his knowledge of Steinman's convicted felon status, gives Steinman the citation, and asks to search the car. 2-ER-41; Bodycam at 16:19:53-16:20:03.

**4:20 p.m. -** Steinman refuses to let Boyer search his car without a warrant and recants his statement about possessing the ammunition. Bodycam at 16:20:24-40.

Boyer gives Steinman the traffic citation, returns his license, and informs Steinman that he is seizing and impounding the car pending a searh warrant.