Case No. 23-1703

# United States Court of Appeals
## for the Ninth Circuit

United States of America,

      Plaintiff/Appellant,

v.

Triston Harris Steinman,

      Defendant/Appellee.

D.C. No. 3:22-cr-68-ART-CLB

Appeal from the United States District Court
for the District of Nevada (Reno)

## Appellee Triston Steinman's
## Answering Brief

Rene L. Valladares
Federal Public Defender
*Jeremy C. Baron
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577 | jeremy_baron@fd.org

*Counsel for Appellee Triston Steinman

# Table of Contents

Table of Contents...............................................................................i

Table of Authorities ....................................................................... iii

Introduction ....................................................................................1

Jurisdictional Statement................................................................3

Issues Presented .............................................................................3

Statement of the Case ....................................................................3

I.  Trooper Boyer conducts a 90-minute stop......................................3

II. The police execute a search warrant and find ammunition
    and alleged silencers in Mr. Steinman's car. ...............................13

III. The government prosecutes Mr. Steinman, and the
     district court suppresses evidence from the car search................14

Summary of the Argument ...................................................17

Argument .....................................................................................19

I.  The police unconstitutionally prolonged the traffic stop..............19

    A.  Trooper Boyer repeatedly prolonged the stop......................20

        1.  The trooper prolonged the stop with detailed
            investigative questioning.............................................20

            a)  The questioning was improper............................21

            b)  The government's arguments are wrong............26

        2.  The trooper prolonged the stop through a
            non-routine criminal history check. ............................30

B.     Trooper Boyer lacked reasonable suspicion to prolong the stop. ................................................................34

    1.     The trooper never developed reasonable suspicion. .... 34

    2.     There was prolongation before 4:28 p.m., when dispatch verified a prior conviction. ............................35

    3.     There was prolongation before 4:08 p.m., when the initial criminal history review ended. ...................38

II.     The police lacked probable cause to seize the car. .........................39

    A.     The police had no basis to seize the car for a potential federal law violation. ...............................................40

    1.     The state police cannot retroactively justify a search or seizure by invoking a federal crime. ............40

    2.     The government relies on irrelevant cases. .................44

    B.     The police had no basis to conclude Mr. Steinman was possessing a gun in violation of state law. ...........................49

III.     The search warrant was overbroad. .............................................55

    A.     Standard of review. ...............................................................56

    B.     The warrant gave permission to seize multiple irrelevant items. ....................................................................56

    C.     The government has waived or forfeited any counterargument. ...................................................................60

Conclusion ....................................................................................................64

Certificates

Appendix

# Table of Authorities

## Cases

*California v. Greenwood*, 486 U.S. 35 (1988) ........................................ 47

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ................................. 57

*Cooper v. California*, 386 U.S. 58 (1967) ........................................ 47, 48

*Edgerly v. San Francisco*, 599 F.3d 946 (9th Cir. 2010) ...................... 47

*Elkins v. United States*, 364 U.S. 206 (1960) ...................................... 48

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ............................................ 36

*In re Riverside-Linden Inv. Co.*, 945 F.2d 320 (9th Cir. 1991) ............ 61

*Loher v. Thomas*, 825 F.3d 1103 (9th Cir. 2016) ................................. 62

*Martinez-Medina v. Holder*, 673 F.3d 1029 (9th Cir. 2011) ................ 45

*Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir. 1986) ........ 61

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005) ................ 39

*Gonzales v. Peoria*, 722 F.2d 468 (9th Cir. 1983) ........................... 44, 45

*Rodriguez v. United States*, 575 U.S. 348 (2015) ..................... 17, 19, 20

*Sharemaster v. SEC*, 847 F.3d 1059 (9th Cir. 2017) ............................ 61

*United States v. $186,416.00 in*
    *U.S. Currency*, 590 F.3d 942 (9th Cir. 2009) ........................ 18, 40, 41

*United States v. Arvizu*, 534 U.S. 266 (2002) ...................................... 55

*United States v. Baker*, 850 F.2d 1365 (9th Cir. 1988) ........................ 51

*United States v. Becerra-Garcia*, 397 F.3d 1167 (9th Cir. 2005) .......... 48

*United States v. Behrens*,
    2019 WL 2997775 (D. Idaho July 9, 2019) ........................................ 29

*United States v. Borbst*, 558 F.3d 982 (9th Cir. 2009) .......................... 48

*United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018) ...................... 53

*United States v. Campbell*,
26 F.4th 860 (11th Cir. 2022) (en banc) ...................................... 22, 23

*United States v. Castro*, 1989 WL 42903 (9th Cir. 1989) ..................... 48

*United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987) ........ 48

*United States v. Clark*, 902 F.3d 404 (3d Cir. 2018) ........................... 22

*United States v. Cole*, 21 F.4th 421 (7th Cir. 2021) (en banc) ............. 27

*United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000) .................... 48

*United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011) .................. 23

*United States v. Dreyer*, 804 F.3d 1266 (9th Cir. 2015) (en banc) .. 61, 62

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ....................... 64

*United States v. Evans*, 786 F.3d 779 (9th Cir. 2015) .................. *passim*

*United States v. Ewing*, 638 F.3d 1226 (9th Cir. 2011) .................. 39, 53

*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015) ................ *passim*

*United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022) .............. 22, 35

*United States v. Garcia*, 205 F.3d 1182 (9th Cir. 2000) ...................... 29

*United States v. Garner*, 961 F.3d 264 (3d Cir. 2020) .................... 23, 24

*United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017) ........................... 22

*United States v. Goodwill*, 24 F.4th 612 (7th Cir. 2022) ..................... 27

*United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017) ................. 21, 24

*United States v. Gray*, 772 F. App'x 565 (9th Cir. 2019) .................... 52

*United States v. Horn*, 234 F. App'x 466 (9th Cir. 2007) .................... 52

*United States v. Hunter*, 88 F.4th 221 (3d Cir. 2023) .................... 30, 31

*United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022) ......................... 30

iv

*United States v. Iturbe-Gonzalez*,
    100 F. Supp. 3d 1030 (D. Mont. 2015) ................................................ 29

*United States v. Jones*, 438 F. Supp. 3d 1039 (N.D. Cal. 2020) ........... 41

*United States v. Kash*, 751 F. App'x 1007 (9th Cir. 2018) ............. 28, 29

*United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019) ............... 22, 39

*United States v. LeBron*, 729 F.2d 533 (8th Cir. 1984) ........................ 58

*United States v. Macias*, 658 F.3d 509 (5th Cir. 2011) ............. 23, 24, 25

*United States v. Mann*, 389 F.3d 869 (9th Cir. 2004) ........................... 57

*United States v. Mendez*, 476 F.3d 1077 (9th Cir. 2007) ...................... 27

*United States v. Moore*, 795 F.3d 1224 (10th Cir. 2015) ...................... 53

*United States v. Nora*, 765 F.3d 1049 (9th Cir. 2014) .............. 18, 49, 50

*United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008) ........... 21, 22, 25

*United States v. SDI Future Health, Inc.*,
    568 F.3d 684 (9th Cir. 2009) .................................................... *passim*

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ........................ 63

*United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992) ............................ 50

*United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) ........................ 59

*United States v. Stepp*, 680 F.3d 651 (6th Cir. 2012) ...................... 22, 23

*United States v. Talley*, 467 F. Supp. 3d 832 (N.D. Cal. 2020) ............. 41

*United States v. Taylor*, 60 F.4th 1233 (9th Cir. 2023) ........................ 30

*United States v. Turvin*, 517 F.3d 1097 (9th Cir. 2008) ....................... 39

*United States v. Ullah*, 976 F.2d 509 (9th Cir. 1992) ............................ 61

*United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990) ................... 49, 57

*United States v. Young*, 707 F.3d 598 (6th Cir. 2012) ........................... 36

*Virginia v. Moore*, 553 U.S. 164 (2008) ........................................... 46, 47

*VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974) ......................... 57

**Other**

Krsna Avila & Lena Graber, *Clean Slate Relief:*
   *The Impact of Criminal Record Sharing and Immigration,*
   Immigrant Legal Resource Center (June 2023).................................. 32

Orin S. Kerr, *Cross-Enforcement of the Fourth Amendment,*
   132 Harv. L. Rev. 471 (2018) ........................................................ 45

## Introduction

A state trooper pulled over Triston Steinman for speeding and conducted a prolonged traffic stop lasting 90 minutes. When the trooper initially approached Mr. Steinman's car, he noticed an ammunition box on the floorboard. Based primarily on that fact, the trooper ordered Mr. Steinman into his patrol car, requested a criminal history check, and began asking investigatory questions. After dispatch confirmed Mr. Steinman had at least one prior felony conviction, the trooper called multiple individuals for advice. The trooper eventually decided to release Mr. Steinman but seize his car. The trooper gave Mr. Steinman the traffic citation nearly 50 minutes into the stop. He then returned Mr. Steinman's driver's license about 90 minutes into the stop. Only at that point was Mr. Steinman free to leave.

After seizing the car, the trooper received a warrant to search the car for all manner of items, including firearms, drugs, and stolen property. The police found ammunition and alleged silencers in the car (among other alleged contraband). The government began prosecuting Mr. Steinman for prohibited person in possession of ammunition, as well as possession of unregistered silencers.

1

Mr. Steinman moved to suppress evidence found during the car search. The district court correctly ordered suppression for three independent reasons. First, the trooper unconstitutionally prolonged the traffic stop without reasonable suspicion: it took 90 minutes to finish the stop, and most of that time was spent investigating a mere hunch. Second, the police lacked probable cause to seize Mr. Steinman's car: they weren't investigating a potential federal criminal violation (prohibited person in possession of ammunition) and had insufficient reason to believe the car contained evidence of a potential state criminal violation (since there's no equivalent state prohibition on possession of ammunition). Third, the search warrant was unconstitutionally overbroad because it unjustifiably authorized police to search for implausible categories like drugs and stolen property along with firearms.

The government has appealed. It presents unconvincing arguments on the first two issues. And it entirely ignores the overbreadth issue—an independent justification for suppression. This Court should affirm.

## Jurisdictional Statement

The government's jurisdictional statement is accurate.

## Issues Presented

1.  Did the police unconstitutionally prolong the 90-minute traffic

    stop without reasonable suspicion?

2.  Did the police lack probable cause to seize the car?

3.  Was the search warrant overbroad because it authorized the

    seizure of irrelevant categories like drugs and stolen property?

## Statement of the Case

### I.   Trooper Boyer conducts a 90-minute stop.

On August 12, 2022, Nevada Highway Patrol Trooper William

Boyer was on duty on a highway outside of Wells, Nevada.  2-ER-23-26.

He saw Mr. Steinman traveling above the posted speed limit and pulled

him over at about 3:51 p.m.  2-ER-26-28.[1]

---

[1] The government's opening brief has a timeline as an appendix. The government's timeline is materially incomplete in part because it omits multiple events occurring after 4:20 p.m.  Mr. Steinman is therefore submitting an alternative timeline as an appendix to this brief.  The times listed on the appendix correspond to the times displayed on Trooper Boyer and Sergeant Marin's body camera videos.

According to Trooper Boyer, he noticed Mr. Steinman moving at the start of the stop. 2-ER-29; *see also* Dashcam Video at 1:02-1:34 (showing minor movements consistent with grabbing a driver's license or looking back at the patrol car).[2]

Trooper Boyer approached the passenger side of the car and explained he pulled Mr. Steinman over for speeding. During an initial conversation, Mr. Steinman explained he previously lived in St. George, Utah; he moved to Washington state for a while but was now moving back permanently to St. George. Bodycam Video at 3:52:08-3:52:20.

Trooper Boyer noticed an ammunition box in the front right floorboard and a blanket over items in the backseat. 2-ER-30. The trooper asked twice what was under the blanket; Mr. Steinman said it was his "stuff." Bodycam Video at 3:52:21-3:52:33. The trooper also asked whether Mr. Steinman had guns or ammunition in the car;

---

[2] The government has filed an unopposed motion to transmit Trooper Boyer's dashboard camera video ("Dashcam Video") and Trooper Boyer's body camera video ("Bodycam Video"). Separately, Mr. Steinman is filing an unopposed motion to transmit Sergeant Marin's body camera video ("Marin Bodycam Video").

Mr. Steinman admitting having ammunition but denied having guns. *Id.* at 3:52:55-3:53:03.

Trooper Boyer returned to his patrol car with Mr. Steinman's driver's license. Bodycam Video at 3:53:05-3:53:18. He went back to Mr. Steinman's car a few minutes later to check the VIN and ask about insurance information. 2-ER-32. Mr. Steinman said his girlfriend would be texting him a copy of the insurance verification. Bodycam Video at 3:55:59-3:56:20.

Trooper Boyer offered to have Mr. Steinman sit in the patrol car while they waited for the insurance information. Bodycam Video at 3:57:22-3:58:17. Mr. Steinman said he'd prefer to stay in the car, get his ticket, and be on his way. *Id.* The trooper explained he had the authority to order him out of the car. *Id.* Mr. Steinman asked why he was being ordered out of the car; the trooper reiterated he had the authority to order him out. *Id.* Mr. Steinman complied with the order and stepped out. *Id.* The trooper asked if everything was okay; Mr. Steinman said he'd been driving from Washington to St. George all day and was just trying to get home. *Id.* The trooper asked if Mr. Steinman had anything on him the trooper needed to be worried

about; Mr. Steinman said no and put his hands up as if to invite a pat down; the trooper directed him into the patrol car's front passenger seat without conducting a pat down. *Id.*

About a minute later—roughly eight minutes into the stop—Mr. Steinman received a copy of the insurance information from his girlfriend via text and showed it to Trooper Boyer. Bodycam Video at 3:59:12-3:59:33; 2-ER-33. Soon after, the trooper logged into the ticket writing software on his patrol computer and began working on the ticket. 2-ER-33-34.

At this point, Trooper Boyer began asking Mr. Steinman a series of questions. He asked how long Mr. Steinman had been in Washington. Bodycam Video at 3:59:45. He asked if this was the first time Mr. Steinman was heading back to Utah. *Id.* at 3:59:55. Mr. Steinman mentioned he'd gotten a ticket on the way up to Washington, and the trooper asked about his route on that trip. *Id.* at 4:00:02-4:00:24. The trooper noticed Mr. Steinman was sweating and told him he could move the air conditioning vents. *Id.* at 4:00:33; *see also id.* at 4:01:33, 4:04:10-4:04:22, 4:07:38; 2-ER-34-35.

6

At about 4:02 p.m.—11 minutes into the stop— Trooper Boyer asked dispatch to run a "T-26," i.e., a criminal history record check. 2-ER-35; Bodycam Video at 4:02:12.

For the next few minutes, Trooper Boyer asked Mr. Steinman additional questions. He asked when Mr. Steinman left Washington that morning. Bodycam Video at 4:03:50. He asked if Mr. Steinman had stopped to rest. *Id.* at 4:03:55. He asked if Mr. Steinman was trying to make the trip in one day. *Id.* at 4:04:32. He asked about Mr. Steinman's employment. *Id.* at 4:04:50. He asked if Mr. Steinman had grown up in Washington. *Id.* at 4:05:40. He asked additional questions about Mr. Steinman's employment in Washington. *Id.* at 4:05:45-4:06:05.

In the middle of this conversation, at about 4:05 p.m., Trooper Boyer received the results from the criminal history check. Bodycam Video at 4:05:21. He left the ticket writing application to review the initial results. *Id.*; 2-ER-36. He continued reviewing the results for over three minutes before leaving that screen for another application. Bodycam Video at 4:05:21-4:08:45. At the same time he was reviewing the results, the trooper discussed the details of the citation with

7

Mr. Steinman; the trooper implied he was cutting Mr. Steinman a break because Mr. Steinman was being "cooperative." *Id.* at 4:08:22, 4:08:25.

Trooper Boyer continued to ask Mr. Steinman questions. He asked where Mr. Steinman had been staying in Washington and whether he was living with family. Bodycam Video at 4:09:12-4:09:30. He asked whether Mr. Steinman had a job or a place to stay lined up in Utah. *Id.* at 4:09:45-4:10:10. He asked follow-up questions about Mr. Steinman's (and his father's) employment. *Id.* at 4:10:50-4:12:05. He asked where Mr. Steinman's girlfriend was living. *Id.* at 4:12:20-4:12:27. He asked about Mr. Steinman's kids and their names. *Id.* at 4:12:36-4:12:48. He asked how Mr. Steinman got the money to afford his car. *Id.* at 4:13:40-4:13:50.

After this exchange, Trooper Boyer asked Mr. Steinman whether he'd ever been in trouble before. Bodycam Video at 4:14:48-4:15:20. Mr. Steinman said he'd been in a little bit of trouble as a teenager or young adult. *Id.* He said he'd had an assault charge; he wasn't sure if it was a felony or not. *Id.* The trooper then asked if Mr. Steinman still shot guns; Mr. Steinman said he didn't; he explained he had the

8

ammunition because someone gave it to him in Washington and he was bringing it back with him. *Id.* at 4:15:28-4:15:40.

Trooper Boyer continued to engage Mr. Steinman in conversation—including further questions about Mr. Steinman's move to Utah and his family—until Sergeant Cruz Marin arrived at the scene. Bodycam Video at 4:16:24-4:19:46. At that point, the trooper told Mr. Steinman that because he had prior felony convictions and ammunition in the car, the trooper "kind of [had] a little PC to search the vehicle." *Id.* at 4:19:53-4:20:42. The trooper asked Mr. Steinman for consent to search. *Id.* Mr. Steinman declined. *Id.* Mr. Steinman also said the ammunition box was empty. *Id.* at 4:20:25-4:20:42.

After ordering Mr. Steinman out of the patrol car, Trooper Boyer began speaking with Sergeant Marin about the situation. The trooper explained what he thought was suspicious about the stop. Bodycam Video at 4:21:40-4:23:25. Mr. Steinman was supposedly agitated. *Id.* He acknowledged one possible felony conviction but failed to mention others. *Id.* He admitted having ammunition in the car. *Id.* He didn't say what was under the blanket in his car. *Id.* He wouldn't provide consent to search. *Id.* His girlfriend and kids were living with his dad

9

in Utah, but he'd gone to Washington without his girlfriend and kids for work and was now moving back to Utah. *Id.*

Sergeant Marin stayed outside with Mr. Steinman while Trooper Boyer returned to his patrol car. The trooper called dispatch and asked them to verify whether the entries on Mr. Steinman's initial criminal history report were actual felony convictions as opposed to just charges. Bodycam Video at 4:26:35-4:26:46. A couple minutes later, the trooper received a call from dispatch confirming Mr. Steinman had at least one prior felony conviction. *Id.* at 4:28:35-4:30:30.

Around the same time, the trooper began calling a series of individuals (likely fellow officers). Some of them didn't answer the phone. Bodycam Video at 4:24:05-4:24:55, 4:27:48-4:28:12, 4:30:35-4:31:05, 4:35:03-4:35:55. One person picked up; the trooper requested a drug dog, but that person said he wasn't working that day. *Id.* at 4:25:23-4:25:54.

The trooper called a lay justice of the peace to ask about submitting a warrant application. Bodycam Video at 4:31:05-4:34:30. The trooper explained the "indicators" he was seeing: Mr. Steinman's move from Washington; the blanket and Mr. Steinman's unwillingness

to specify what was under the blanket; the prior felony convictions; the ammunition box; and Mr. Steinman admitting he had ammunition. *Id.* The trooper said Mr. Steinman appeared nervous; he was sweating, a vein in his neck was bulging, and he was initially hesitant to get out of his car and eager to continue his journey. *Id.* The trooper ended the call by saying he would formally seize the car and submit a warrant application. *Id.*

Shortly after he finished speaking with the lay justice of the peace, Trooper Boyer got out of the patrol car to discuss the situation again with Sergeant Marin. The trooper said the lay justice had told him to submit a warrant application. Bodycam Video at 4:36:26-4:36:50. The trooper said he still needed to issue the citation to Mr. Steinman before Mr. Steinman could leave. *Id.* The trooper then got back into his patrol car and printed out the citation. *Id.* at 4:37:00-4:38:10. At about 4:38 p.m.—nearly 50 minutes into the stop—the trooper stepped out of the patrol car and gave Mr. Steinman the citation. Bodycam Video at 4:38:25-4:40:04. The trooper asked for a tow company to come tow Mr. Steinman's car a few minutes later. 2-ER-47; 3-ER-277 (entry at 16:43:30).

11

Trooper Boyer got back into the patrol car and began drafting the warrant application. He spoke to one individual over the phone to ask for a template. Bodycam Video at 4:45:40-4:46:50. He spoke with a few other individuals over the phone to discuss the situation. *Id.* at 4:47:52-4:55:55, 5:05:10-5:11:50, 5:14:03-5:17:41. In between those calls, Sergeant Marin approached the patrol car; they discussed (among other things) whether they had probable cause to search. Bodycam Video at 4:57:32-5:01:57.

Eventually, Sergeant Marin asked whether Mr. Steinman was free to leave. Bodycam Video at 5:22:01-5:22:40. Trooper Boyer said he was. *Id.* At that point—about 90 minutes into the stop—the police returned Mr. Steinman's documentation. Marin Bodycam Video at 5:24:13-5:25:25. Mr. Steinman then left the scene on foot toward Wells. *Id.* The tow company arrived, so Sergeant Marin drove off in his patrol car. He picked up Mr. Steinman along the way and dropped him off in Wells. *Id.* at 5:33:35-5:52:56.

## II. The police execute a search warrant and find ammunition and alleged silencers in Mr. Steinman's car.

Trooper Boyer submitted a search warrant application to the lay justice of the peace. 3-ER-345-52. According to the application, Mr. Steinman appeared overly nervous and eager to finish the stop; he was sweating, one of his veins was pulsing, and he was reluctant to look at the trooper. 3-ER-347. He was hesitant to get out of his car and into the patrol car. *Id.* He had a blanket over items in the car and didn't specify what those items were. *Id.* There was an ammunition box in the car, and Mr. Steinman admitted there was ammunition in the car; later, he said the ammunition box was empty. 3-ER-347-48. His criminal history included prior felony convictions, but Mr. Steinman gave incomplete answers about his criminal history. 3-ER-348. Mr. Steinman appeared nervous while the police were waiting for a tow and eventually left on foot. *Id.*

The warrant application sought authority to search Mr. Steinman's car for items including "stolen property, controlled substances, paraphernalia, [and] illicit firearms." 3-ER-351.

The lay justice of the peace authorized the warrant. 3-ER-351-52.

13

The police executed the warrant and conducted a search. Among other things, they found firearms, ammunition, and alleged unfinished firearm suppressors. 3-ER-356. The police then arrested Mr. Steinman in Wells. 3-ER-358.

### III. The government prosecutes Mr. Steinman, and the district court suppresses evidence from the car search.

After initial state court proceedings, a federal grand jury issued a superseding indictment charging Mr. Steinman with one count of prohibited person in possession of ammunition and one count of possession of unregistered firearms, i.e., six unregistered silencers. 3-ER-462-63.

Mr. Steinman filed a motion to suppress. 3-ER-294-461. Among other things, he argued Trooper Boyer unconstitutionally prolonged the stop; the police lacked probable cause to seize the car; and the search warrant was defective.

The district court presided over an evidentiary hearing. 2-ER-20-184. The government's only witness was Trooper Boyer. He acknowledged a typical traffic stop takes him only 15 minutes, not 90 minutes. 2-ER-104.

14

After the hearing, the district court issued an oral ruling granting the motion to suppress.  1-ER-4-18.  As it explained, the trooper "unreasonably prolonged" the traffic stop.  1-ER-7.  He prolonged the stop in part through his "detailed questioning of Mr. Steinman."  *Id.*  He also prolonged the stop through the criminal history check; that check wasn't a "routine" check but instead an improper investigatory check. *Id.*  "The process of issuing the citation was slowed down significantly by the questioning and by the criminal history checks."  *Id.*  The trooper was "slow playing . . . the citation process," and the stop lasted a full "90 minutes."  *Id.*

The district court concluded there was no reasonable suspicion to justify the prolongation.  1-ER-10.  The trooper suggested Mr. Steinman was sweating from nervousness, but it was "90 degrees that day."  *Id.*; *see also* Opening Brief at 19 (noting "the dangers of . . . the summer sun").  "[T]here is nothing outside the norm of his behavior."  1-ER-10. "There's some degree of nervousness or discomfort which is normal in the context of being pulled over by a police officer and ordered out" of a car.  *Id.*  The only fact the trooper had to support reasonable suspicion "was a box of ammunition which is legal to possess in Nevada, even for

15

a felon." *Id.* "The Court cannot find that reasonable suspicion justified any prolongation of the stop." 1-ER-12.

In the alternative, the district court found "[t]here was no probable cause to seize the vehicle." 1-ER-14. "Even assuming there was no unlawful prolongation, nothing in the testimony or evidence . . . gave [Trooper] Boyer sufficient information to rise to the level of probable cause." *Id.* "The seizure of his vehicle was based on his hunch that because he had ammunition and was nervous and a felon, he would also have a gun." *Id.*

Finally, "the search warrant was impermissibly overbroad in violation of constitutional safeguards." 1-ER-15. "The government concedes that there was no probable cause to seize" multiple items listed in the warrant: "controlled substances, paraphernalia, and stolen items." 1-ER-16. "[T]he category of stolen items" was especially problematic because the "illicit nature" of stolen property isn't immediately "apparent"; anything in the car might qualify. *Id.* Thus, "even assuming" that "the warrant established probable cause for the seizure of firearms," "most categories of the warrant were overbroad." *Id.* And severance was an unavailable remedy because "the valid

16

portion . . . [was] a relatively insignificant part of" the warrant. 1-ER-17. The court also noted concerns with portions of the warrant application that relied on information improperly obtained during the prolonged detention. 1-ER-15, 17.

The district court made it "clear" it was "suppressing on multiple independent grounds": first, the "prolonged detention unsupported by reasonable suspicion"; second, the lack of "probable cause to seize the vehicle"; and third, "[t]he warrant is invalid and cannot be saved by severance or good faith." 1-ER-17.

The government appealed the suppression order. 3-ER-466-67.

## Summary of the Argument

The district court suppressed evidence from Mr. Steinman's car for three independent reasons. Its reasoning is sound on all fronts.

First, the district court correctly concluded Trooper Boyer unconstitutionally prolonged the 90-minute stop. *See Rodriguez v. United States*, 575 U.S. 348 (2015). The trooper delayed the citation process while asking Mr. Steinman investigatory questions. The trooper further delayed the process by reviewing and seeking clarification regarding criminal history records on a non-routine basis.

17

And he delayed the citation process even more while he spoke with additional officers about the situation. Throughout this process, Trooper Boyer lacked reasonable suspicion to keep Mr. Steinman detained. The 90-minute stop was unconstitutionally prolonged, and this Court should affirm.

Second, even if there was no prolongation, the district court correctly determined the police lacked probable cause to seize the car. The state police seized the car based on a potential state criminal violation: possession of a firearm by a prohibited person. But the trooper lacked probable cause to believe Mr. Steinman was possessing a gun. *See United States v. Nora*, 765 F.3d 1049, 1058-59 (9th Cir. 2014). While there may have been probable cause to believe Mr. Steinman was violating federal law as a prohibited person possessing ammunition, Nevada law (unlike federal law) allows individuals with prior felony convictions to possess ammunition. Because the state trooper seized the car based on a potential state violation, not a federal violation, the government cannot retroactively justify the seizure based on a federal crime. *See United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942 (9th Cir. 2009). The Court should affirm on this ground as well.

18

Third, even if the police had probable cause to seize the car, the district court correctly found the search warrant unconstitutionally overbroad. *See United States v. SDI Future Health, Inc.*, 568 F.3d 684, 707 (9th Cir. 2009). The warrant authorized the police to seize a laundry list of items—including drugs and stolen property—for which there was no probable cause. The government's opening brief fails to address this independent basis for suppression, so it has waived or forfeited any counterargument. The Court should once again affirm.

## Argument

## I. The police unconstitutionally prolonged the traffic stop.

Under the Fourth Amendment, police officers have authority to stop a motorist who commits a traffic violation. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015). But the police don't have unfettered discretion to keep motorists detained for non-traffic-related investigative purposes. Rather, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (cleaned up). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or

19

reasonably should have been—completed." *Id.* A stop becomes prolonged if the officer extends it for unrelated purposes. *See id.* at 357. Even minor delays can amount to prolongation. *See id.* at 353 (noting the lower court's erroneous conclusion that a "de minimis" prolongation is acceptable) (cleaned up). If the police prolong a traffic stop for investigatory purposes, the prolongation is unconstitutional, "absent . . . reasonable suspicion" for an independent offense. *Id.* at 355.

Here, Trooper Boyer prolonged the stop without reasonable suspicion, so suppression was appropriate.

### A. Trooper Boyer repeatedly prolonged the stop.

Trooper Boyer unlawfully prolonged the stop in multiple respects, including by asking detailed investigative questions and by conducting a non-routine, investigatory criminal history check.

### 1. The trooper prolonged the stop with detailed investigative questioning.

The trooper prolonged the stop by asking multiple questions as part of his investigation into potential criminal activity.

### a) The questioning was improper.

If an officer questions a driver for investigative purposes, the questioning can amount to prolongation. *See United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017). In *Gorman*, the trooper pulled over the defendant and developed a hunch the defendant was smuggling drugs. The trooper finished his routine traffic inquiries and decided not to issue a citation. But the trooper "prolonged the roadside detention even further by questioning [the defendant] more pointedly" about "how he could afford" his cross-country trip and "how much money" the defendant made in his line of work. *Id.* at 711. "Detaining [the defendant] longer than it took to complete the stop's mission unquestionably violated the Constitution." *Id.* at 715.

In *Gorman*, the prolongation occurred after the traffic-related tasks were complete. But officer questioning can amount to prolongation even before those tasks are done. The decision in *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008), is an example. There, the trooper "engaged in what he called a 'blended process,' interspersing drug interdiction questions with the routine processing of [the] traffic stop." *Id.* at 1120. Because "[t]he extent and duration of the trooper's

focus on non-routine questions prolonged the stop beyond the time reasonably required to complete its purpose," the stop was unlawful, even though the traffic stop wasn't finished when this improper questioning occurred. *Id.* at 1121; *see also United States v. Landeros*, 913 F.3d 862, 868-70 (9th Cir. 2019) (finding prolongation where the officer asked passengers unrelated questions at the outset of the stop); *United States v. Evans*, 786 F.3d 779, 786-87 (9th Cir. 2015) (explaining it's "immaterial" whether prolongation occurs "before" or after "the officer issue[s] a ticket") (cleaned up).[3]

---

[3] *See also, e.g.*, *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) ("[E]ach minute that the trooper spent arranging the dog sniff was time the citation-related tasks went unaddressed."); *United States v. Campbell*, 26 F.4th 860, 884-85 (11th Cir. 2022) (en banc) (concluding "an officer can prolong a stop" by asking "unrelated questions" either "before or after completing the investigation"—even if the prolongation is only "twenty-five seconds"); *United States v. Clark*, 902 F.3d 404, 410-11 & n. 4 (3d Cir. 2018) (concluding the officer's questions about the defendant's criminal record weren't "tied to the traffic stop's mission" and therefore "impermissibly extended the stop" for "20 seconds") (cleaned up); *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017) ("[A]n officer may not consume much of the time justified by the stop with inquiries about offenses unrelated to the reasons for the stop."); *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) ("Because a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her

Here, much of Trooper Boyer's detailed questioning was neither traffic-related nor safety-related and therefore amounted to unlawful prolongation.

The trooper asked Mr. Steinman what was under the blanket in his backseat. Bodycam Video at 3:52:21-3:52:33. Those questions weren't mission- or safety-related. *See Campbell*, 26 F.4th at 885 (explaining the officer impermissibly asked about "contraband").

The trooper asked Mr. Steinman about his and his family's living arrangements—how long he'd been in Washington; where he'd be living in Utah; where his father, girlfriend, and kids were living; and more. Bodycam Video at 3:59:45-3:59:55, 4:05:40; 4:09:12-4:09:30, 4:09:45-4:10:10, 4:12:20-4:12:48, 4:19:10-4:19:46. Those questions weren't traffic- or safety-related. *See United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (explaining the officer's questions about the defendant's "family" were "unrelated to the traffic stop"); *United States v. Macias*,

_____

hunches were unfounded, we also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure."); *United States v. Digiovanni*, 650 F.3d 498, 510 (4th Cir. 2011) (citing *Peralez* with approval), *abrogated in part on other grounds by Rodriguez*, 575 U.S. at 356-57.

23

658 F.3d 509, 519 (5th Cir. 2011) (similar); *see also* Opening Brief at 20 (citing *Garner*).

The trooper asked Mr. Steinman about his employment. Bodycam Video at 4:04:50, 4:05:45-4:06:05, 4:09:45-4:10:10, 4:10:50-4:12:05. Those questions weren't traffic- or safety-related. *See Garner*, 961 F.3d at 271 (explaining the officer's questions about the defendant's "employment" were "unrelated to the traffic stop"); *Macias*, 658 F.3d at 519 (similar).

The trooper asked Mr. Steinman how he got the money to afford his car. Bodycam Video at 4:13:40-4:13:50. Those questions weren't traffic- or safety-related. *See Gorman*, 859 F.3d at 711 (noting the officer asked the defendant "how he could afford" his trip and "how much money [he] made").

The trooper asked Mr. Steinman whether he'd been in trouble before and whether he had any prior felony convictions. Bodycam Video at 4:14:48-4:15:20. Those questions weren't traffic- or safety-related. *See Garner*, 961 F.3d at 271 (explaining the officer's questions about the defendant's "criminal history" were "unrelated to the traffic stop"); *Macias*, 658 F.3d at 519 (explaining the officer's questions about

24

whether the defendant "had been in 'trouble' previously" weren't mission-related).

The trooper asked Mr. Steinman whether he still shot guns. Bodycam Video at 4:15:28-4:15:40. Those questions weren't traffic- or safety-related.

In sum, Trooper Boyer repeatedly asked Mr. Steinman questions on various topics of investigative interest. Those non-traffic- and non-safety-related questions prolonged the stop because they delayed the trooper from finishing the citation. As the district court explained, the trooper was "slow playing . . . the citation process"—which took nearly 50 minutes—for investigatory purposes. 1-ER-8. "The seizure was . . . unreasonably prolonged by the detailed questioning of Mr. Steinman, which . . . distracted from Trooper Boyer's ability to actually verify his information and complete and then issue the citation." 1-ER-7. "The process of issuing the citation was slowed down significantly by the questioning." 1-ER-8. In other words, the trooper "engaged in . . . a 'blended process,' interspersing [investigatory] questions with the routine processing of [the] traffic stop." *Peralez*, 526 F.3d at 1120.

Because the improper questioning extended the stop, the stop was
prolonged.

### b) The government's arguments are wrong.

The government insists there was no prolongation. The Court
should reject its argument.

According to the government, Trooper Boyer's questions were
"largely" permissible travel-plan questions that were plausibly tied to
the mission of the traffic stop. Opening Brief at 20. Assuming travel-
plan questions can fall within a stop's mission, there were multiple non-
travel plan questions in this case, as explained above: for example,
detailed questions about Mr. Steinman's family and employment. *See
id.* at 21 (acknowledging the trooper asked questions "[b]eyond travel-
plan related questions," such as "questions about his personal
background").

Even if (contrary to fact) the trooper had asked purely travel-
related questions, there was still prolongation. While some courts have
concluded officers may ask limited travel-plan questions as part of the
mission of the traffic stop, "travel-plan questions go too far when they
are no longer reasonably related to the stop itself (and related safety

concerns) but rather reflect an independent investigation of other criminal activity." *See United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc); Opening Brief at 20 (citing *Cole*). Here, the extent of the questioning—travel plan or otherwise—was unreasonable.

The government asserts there was no measurable prolongation because the trooper "posed [the improper] questions while completing the citation," so "the questions did not extend the length of" the stop. Opening Brief at 21. In other words, the government insists there was no prolongation because the trooper was multitasking. But the government is attempting to relitigate a purely factual issue. "Whether unrelated questioning prolongs a stop is a factual issue that [appellate courts] review for clear error." *United States v. Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022); *see also United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) ("[T]he district court's factual determination that the officers were diligently pursuing the purpose of the traffic stop was not clearly erroneous."). The district court explicitly concluded as a factual matter that the trooper slow played the citation process, and the trooper's extended questioning interfered with his ability to diligently complete the stop. That factual conclusion deserves deference on

27

appeal; indeed, the government makes no effort to demonstrate this factual conclusion is clearly wrong.

The government suggests the questioning didn't prolong the stop because the trooper asked the questions while waiting for "the results of the [criminal history] check." Opening Brief at 21. As explained below, the check itself amounted to prolongation. Even assuming otherwise, the government's argument fails. As the trooper's bodycam video shows, the trooper requested the check at about 4:02 p.m.; the initial results came back at about 4:05 p.m. As explained above, much of the objectionable questioning occurred outside this limited timeframe, i.e., before 4:02 p.m. and after 4:05 p.m. In any event, the questions within this three-minute period still prolonged the stop because the citation wasn't complete until much later. 2-ER-35-39. In other words, the trooper could've been diligently finishing the ticket while he was waiting on the results of the check, and his questions impeded him from doing that.

To support its view, the government cites various cases, none of which is persuasive. Opening Brief at 22-23. It primarily relies on *United States v. Kash*, 751 F. App'x 1007 (9th Cir. 2018) (unpublished).

There, the driver "sat in the officer's car while the officer wrote the citation and ran routine checks." *Id.* at 1010. "During this time, the officer engaged [the driver] in casual conversation." *Id.* The district court concluded the casual conversation "did not prolong the traffic stop." *Id.* This Court issued an unpublished memorandum decision affirming that factual finding. *Id.* Here, by contrast, the district court made the opposite factual finding: the trooper's detailed questioning *did* interfere with processing the stop. Nothing in *Kash* suggests that finding is improper.[4] The Court should affirm the district court's factual finding in this case, as it did in *Kash*.

In sum, the district court permissibly concluded Trooper Boyer's detailed investigative questioning prolonged the stop. The government

_____

[4] The government's other citations fail to persuade. *See United States v. Garcia*, 205 F.3d 1182, 1187 (9th Cir. 2000) (concluding, in a pre-*Rodriguez* decision, that a "brief conversation . . . did not cause any additional delay"); *United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030, 1037 (D. Mont. 2015) (rejecting a *Miranda* argument, determining the trooper "diligently worked to process the traffic violation," and concluding the trooper's "inquiries into unrelated matters did not measurably prolong the stop"); *United States v. Behrens*, No. 1:19-cr-44-BLW, 2019 WL 2997775, at *5 (D. Idaho July 9, 2019) (explaining the challenged questioning occurred while the trooper waited for the driver "to find his registration," so the "questions did not prolong the stop").

fails to argue (much less demonstrate) this factual finding was clearly erroneous.  The Court should affirm that finding.

### 2. The trooper prolonged the stop through a non-routine criminal history check.

Trooper Boyer prolonged the stop by ordering the criminal history check, reviewing it in detail, then seeking follow-up information—all for investigatory purposes.

Generally, an officer can order a criminal history check during a traffic stop "because a criminal history check stems from the mission of the stop itself [and] is a negligibly burdensome precaution necessary to complete the stop safely."  *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022); *see also United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023).  But "under [some] circumstances, a criminal record check may be unreasonable if it is more than negligibly burdensome and thus exceeds the stop's mission."  *United States v. Hunter*, 88 F.4th 221, 226 (3d Cir. 2023); *cf. Evans*, 786 F.3d at 787 n. 7 ("Even before *Rodriguez*, courts observed that extending traffic stops to perform criminal history checks may be unlawful.").

The criminal history check in this case was "unreasonable" because it was "more than negligibly burdensome and thus exceed[ed] the stop's mission." *Hunter*, 88 F.4th at 226. It exceeded the stop's mission in part because the check had no plausible relationship to officer safety. At the time Trooper Boyer requested the check (at about 4:02 p.m.), the trooper had already ordered Mr. Steinman out of his car, declined to frisk him, placed him in the front passenger seat of the patrol car next to the trooper, and finished reviewing Mr. Steinman's documentation. If a trooper orders a criminal history check under these unique circumstances, the check cannot be deemed a routine, minimally invasive check for officer safety purposes. *See* 1-ER-8 ("That first criminal history check was not routine."). Indeed, the trooper admitted he doesn't conduct routine criminal history checks and instead relies on them for investigatory purposes. 2-ER-106-07.

After receiving the results from the initial check, the trooper left the computer's citation-writing application and spent over three minutes reviewing the results. Bodycam Video at 4:05:21-4:08:45. This lengthy review distracted the trooper from the citation-writing process and therefore further prolonged the stop. 2-ER-76.

31

The results from the initial check were unreliable because the results didn't specify whether the entries corresponded to actual felony convictions, or whether the entries were instead mere felony charges that were dropped (or that resulted in misdemeanor convictions).[5] The trooper therefore asked dispatch to clarify the results. Bodycam Video at 4:26:35-4:26:46. Dispatch called back and discussed the results with the trooper for nearly two minutes. *Id.* at 4:28:35-4:30:30. The trooper asked dispatch to further research one of the entries, but it appeared further research that day would be inconclusive. *Id.* at 4:29:55-4:30:08, 4:51:22-4:51:37. All this follow-up investigation has no plausible relationship to officer safety and was more than negligibly burdensome. *See* 1-ER-8-9 ("Even if that initial criminal history check was

---

[5] The initial results were from the National Crime Information Center's Interstate Identification Index. 3-ER-263. Under the index, states "fall into two categories": those that opt into the National Fingerprint File Program, and those that don't. *See* Krsna Avila & Lena Graber, *Clean Slate Relief: The Impact of Criminal Record Sharing and Immigration*, Immigrant Legal Resource Center, at 2 (June 2023), *available at* https://www.ilrc.org/sites/default/files/2023-06/06-23%20clean%20slate%20relief_0.pdf. If a state doesn't opt into that program, the criminal history results from that state may be out of date and "not in alignment with the state's records." *Id.* Thus, when an officer searches the index, it may not be immediately apparent whether a state's results are up to date.

32

permissible, I'm still left with the fact that Trooper Boyer is prolonging the whole process of the traffic mission through his interrogation and research on his criminal history.").

The government insists the district court erroneously relied on Trooper Boyer's "subjective intent," i.e., his "testimony that he ran the check for investigatory purposes, rather than for officer safety." Opening Brief at 25. But the analysis is objective: if an officer runs a criminal history check in the circumstances presented here—after the officer has ordered the driver out of the driver's car and into the patrol car, without even bothering to conduct a pat down, and after the officer has finished reviewing the driver's documentation—then as an objective matter the check cannot be justified as an officer safety measure. And if an officer requests further clarification from dispatch regarding the report (because the initial report is inconclusive or unreliable) and has a detailed follow-up discussion with dispatch about the driver's criminal history, then that follow-up activity is even more attenuated from officer safety. Trooper Boyer's detailed criminal history investigation therefore prolonged the stop.

## B. Trooper Boyer lacked reasonable suspicion to prolong the stop.

Trooper Boyer repeatedly prolonged the traffic stop for investigatory purposes. The trooper therefore acted unlawfully—unless the trooper had reasonable suspicion to support the investigatory detention. He lacked reasonable suspicion, so the prolongation violated the Fourth Amendment.

### 1. The trooper never developed reasonable suspicion.

As explained below, the police didn't have probable cause to seize Mr. Steinman's car. The Nevada state trooper was investigating a potential state criminal violation (prohibited person in possession of a firearm), not a potential federal criminal violation (prohibited person in possession of ammunition), so the prolongation cannot be justified based on a potential federal offense. And Trooper Boyer had no legitimate basis to believe Mr. Steinman was possessing a firearm. The car seizure was therefore unconstitutional.

For substantially the same reasons, the police never developed reasonable suspicion Mr. Steinman was committing a state crime. The stop's prolongation was therefore unlawful.

### 2. There was prolongation before 4:28 p.m., when dispatch verified a prior conviction.

Assuming for the sake of argument Trooper Boyer developed reasonable suspicion of some appropriate crime by 4:28 p.m.—when dispatch confirmed Mr. Steinman had at least one prior felony conviction—there was still repeated prolongation up to that point, including the trooper's detailed questioning before 4:28 p.m. and the initial criminal history check.[6]  That prolongation was unlawful.

Trooper Boyer lacked reasonable suspicion until 4:28 p.m. at the earliest.  As the bodycam video shows, Trooper Boyer received the initial criminal history report at about 4:05 p.m.  He spent over three minutes reviewing that report.  He then asked dispatch at 4:26 p.m. to verify whether any of the entries were actual convictions.  At about 4:28 p.m., dispatch responded.  It explained some of the entries didn't

---

[6] Aside from the questioning and the criminal history check, the trooper further prolonged the stop before 4:28 p.m. in at least two respects:  the trooper and the sergeant spoke at length about the situation, including whether to apply for a warrant; and the trooper called (or attempted to call) various people and tried to arrange for a drug dog.  *See, e.g.*, Bodycam Video at 4:21:40-4:23:25, 4:25:23-4:25:54; *see also Frazier*, 30 F.4th at 1174 (explaining an officer prolongs a stop by arranging for a drug dog).

correspond to actual felony convictions, but Mr. Steinman had at least one prior felony conviction. 2-ER-79.

As this exchange shows, the initial criminal history report was unreliable. The "experienced trooper" (Opening Brief at 4-5; *see* 2-ER-24) determined the report was unclear and therefore asked dispatch to perform further research. Dispatch eventually concluded some of the entries didn't correspond to actual felony convictions—likely because the database can include out-of-date information. Because the initial criminal history results were unreliable, they failed to provide reasonable suspicion. *See United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) ("[R]easonable suspicion looks for the exact opposite of ambiguity.") (cleaned up); *but cf. Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (suggesting "ambiguous" "conduct" like running away from the police can support reasonable suspicion). Indeed, the trooper himself seemed to admit he didn't have reasonable suspicion until dispatch confirmed Mr. Steinman had at least one prior felony conviction. 3-ER-409-10.

The government insists Trooper Boyer had reasonable suspicion based on the results of the initial criminal history report. Opening

Brief at 23-24.  But the initial report was misleading—as the trooper himself demonstrated by requesting clarification from dispatch, and as dispatch confirmed when it noted some of the entries didn't correspond to actual felony convictions.  The government fails to address the report's unreliable nature.

Nor were there any other factors that provided reasonable suspicion.  As explained below, the relevant circumstances—Mr. Steinman's alleged suspicious movement at the start of the stop; the ammunition box; his admission that he had ammunition; and his alleged nervousness during the stop (e.g., sweating on a hot Nevada summer day)—fall short of probable cause.  *See* Opening Brief at 35 (listing these factors).  For substantially the same reasons, those circumstances cannot meaningfully contribute to reasonable suspicion.  Trooper Boyer had no legitimate basis to suspect criminal activity until 4:28 p.m. at the very earliest, so the repeated delays leading up to 4:28 p.m. amounted to an unconstitutional prolongation of the traffic stop.

### 3. There was prolongation before 4:08 p.m., when the initial criminal history review ended.

The government incorrectly asserts Trooper Boyer had reasonable suspicion as early as 4:08 p.m., based primarily on the results of the initial criminal history report.[7]  As explained above, the government is incorrect.

Assuming otherwise, Trooper Boyer nonetheless unreasonably prolonged the stop leading up to 4:08 p.m. by requesting and reviewing the check at length in the first instance and by asking investigatory questions.  The improper investigatory questions in this timeframe covered topics such as what was under Mr. Steinman's blanket (Bodycam Video at 3:52:21-3:52:33); Mr. Steinman and his family's living arrangements (*id.* at 3:59:45-3:59:55, 4:05:40); and Mr. Steinman's employment (*id.* at 4:04:50, 4:05:45-4:06:05).

The government suggests these questions were only a de minimis prolongation.  Opening Brief at 14-15.  But there's no de minimis exception to the prolongation doctrine.  *See Evans*, 786 F.3d at 785-86

---

[7] The government specifically references 4:06 p.m.  Opening Brief at 24.  But the trooper didn't finish reviewing the results until 4:08 p.m.

(discussing *Rodriguez*). The government's contrary citation—*United States v. Turvin*, 517 F.3d 1097 (9th Cir. 2008)—was abrogated by *Rodriguez*. *See Landeros*, 913 F.3d at 866-67.

The prolongation leading up to 4:08 p.m. is enough to require suppression. The Court should affirm.

## II. The police lacked probable cause to seize the car.

The police violated Mr. Steinman's Fourth Amendment rights by seizing his car without probable cause.

If the police tow and "impound[]" a car, the police have conducted "a seizure within the meaning of the Fourth Amendment." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). The police may seize a car without a warrant if the police have probable cause to believe the car "contains evidence of a crime." *United States v. Ewing*, 638 F.3d 1226, 1231 (9th Cir. 2011).

Here, Trooper Boyer seized Mr. Steinman's car in anticipation of applying for a state search warrant. The seizure is therefore unconstitutional unless the trooper had probable cause to believe the car would contain evidence of a state law crime. The trooper lacked probable cause for a relevant state offense. The seizure and ensuing

search were therefore improper, and the district court correctly ordered suppression.

## A. The police had no basis to seize the car for a potential federal law violation.

By the time he seized Mr. Steinman's car, Trooper Boyer arguably had reason to believe Mr. Steinman violated the federal law preventing prohibited persons from possessing ammunition. But that federal offense has no relevance to the probable cause analysis.

### 1. The state police cannot retroactively justify a search or seizure by invoking a federal crime.

If the state police seize a car so they can apply for a search warrant based on a suspected state criminal offense, and if the warrant application fails to demonstrate probable cause for that state offense, the state police cannot retrospectively justify the seizure based on a separate federal offense.

The Court's decision in *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942 (9th Cir. 2010), establishes this point. The state police executed a warrant to search a medicinal cannabis dispensary for asserted state law violations. The dispensary argued the warrant was invalid. This Court agreed. The warrant application omitted

information showing the dispensary was likely operating in compliance with state law. While the dispensary may have been violating federal law, the state police "never initiated the process of seeking a federal search warrant from a federal magistrate or indicated that it was pursuing a violation of federal law." *Id.* at 948. There was no suggestion the state police "thought [they were] pursuing a violation of federal law." *Id.* So even if there was "probable cause to search [the dispensary] for a violation of federal law," that federal law didn't provide a basis to uphold the state law search. *Id.*[8]

Under *U.S. Currency*, if a state officer executes a search warrant based on a suspected state law violation, and if a court later determines there was no probable cause for the state law violation, the government cannot retrospectively justify the search by invoking a potential federal law violation. For the same reasons, if a state officer seizes a car and

_____

[8] *See also United States v. Talley*, 467 F. Supp. 3d 832, 836 (N.D. Cal. 2020) (explaining "the Ninth Circuit has previously held that local police officers did not have probable cause based on alleged violations of federal law when the officers were, at the time, investigating a violation of *state* law" and citing *U.S. Currency*); *United States v. Jones*, 438 F. Supp. 3d 1039, 1053-54 (N.D. Cal. 2020) (explaining the state officers were "charged with enforcing [state] law, not federal law," so there was no probable cause based on a purely "federal law" crime).

then seeks a search warrant based on a state crime, and if there's no probable cause to support that state crime, the government cannot rely on a purported federal crime to provide a post hoc justification for the initial seizure.

Those principles apply here. Trooper Boyer testified he was a state official investigating state crimes, not a federal official investigating federal crimes. 2-ER-49-50. He seized the car and then submitted a state search warrant application listing the potential state offense of "prohibited person possessing firearms"—not a potential federal offense for possession of ammunition. 3-ER-345. He sought permission to seize "illicit firearms" but didn't seek permission to seize ammunition. 3-ER-351. Because the trooper seized the car and sought a search warrant for a state offense, the government cannot retrospectively justify the seizure by suggesting a potential federal basis for investigation.

The government attempts to distinguish *U.S. Currency*. It correctly explains *U.S. Currency* invalidated the state warrant because the state "officers had sought a warrant predicated solely on probable cause of a violation of state law," not federal law. Opening Brief at 33.

42

But it suggests *U.S. Currency* doesn't "foreclose the possibility that the state officers could have obtained and executed a warrant to search for evidence of a federal crime if they had submitted an affidavit that alleged a federal violation." *Id.* at 33-34. And it suggests the decision is irrelevant "in the warrantless-search context," where the police aren't submitting a warrant application indicating "what particular crimes they suspect may have been committed." *Id.* at 34.

The government's logic is unconvincing. Trooper Boyer seized Mr. Steinman's car so he could seek a state search warrant. The state search warrant requests authorization to search for evidence of a state crime (prohibited person in possession of a firearm), not a federal crime (prohibited person in possession of ammunition). Even if the trooper could've theoretically sought a warrant to search for evidence of a *federal* crime, that's not what occurred here. Nor is this a warrantless-search case; to the contrary, the trooper applied for and received a warrant. The government's attempts to address *U.S. Currency* fall flat.

The government also insists *U.S. Currency* improperly turns on the "subjective[]" motivations of the investigating officers. Opening Brief at 34. It doesn't; it simply relies on objective information from the

43

warrant application.  As in *U.S. Currency*, the warrant application in this case is objectively targeted at a state offense, not a federal offense.  The seizure must therefore be justified by way of a state criminal violation, not a federal criminal violation.

### 2.  The government relies on irrelevant cases.

The government maintains the potential federal crime justifies the seizure and seeks support from a series of unrelated cases.  Those citations are unconvincing.

First, the government relies on *Gonzales v. Peoria*, 722 F.2d 468 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).  Opening Brief at 30.  In that civil immigration case, the plaintiffs alleged city police were unconstitutionally arresting people of Mexican descent.  The Court considered whether state law granted local police "the affirmative authority to make arrests under" federal criminal immigration laws.

*Gonzales*, 722 F.2d at 475.  The Court surveyed Arizona state law and concluded state law enforcement had this authority.  *Id.* at 475-77.[9]

*Gonzales* has little application here.  That case involves the question whether a state officer has authority under state law (and thus under federal constitutional law) to *arrest* an individual for a federal crime.  *See* Orin S. Kerr, *Cross-Enforcement of the Fourth Amendment*, 132 Harv. L. Rev. 471, 479-82 (2018) (discussing *Gonzales* and citing similar cases).  The question here involves a distinct *search and seizure* issue:  if state officers seize a car and seek a search warrant based on a state offense, and if there's no probable cause for that state offense, can the officers retrospectively justify the seizure by invoking a potential federal offense?  *U.S. Currency* provides the answer, not *Gonzales*.

The government insists that under *Gonzales*, Nevada is similarly situated to Arizona and has granted its law enforcement officials the authority to arrest suspects for federal criminal offenses.  Opening Brief at 29-30.  But it cites no Nevada statute that expressly provides this

---

[9] *Cf. Martinez-Medina v. Holder*, 673 F.3d 1029, 1037 (9th Cir. 2011) (finding no Fourth Amendment violation when the police arrested an individual for a federal immigration offense despite state law affirmatively disclaiming authority to arrest).

authority; it instead relies on generic statutes. *Id.* More importantly, the government cites no Nevada statute for the proposition that a state officer can seize a car without a warrant for the sole purpose of searching for evidence of a federal crime. *Id.* at 29 (admitting "Nevada statutory law does not speak clearly to authority to search"). The lack of such a statute undercuts the government's analogy to *Gonzales*.

Second, the government relies on the general proposition that the Fourth Amendment's meaning is a question of federal law, not state law. Opening Brief at 30-32. That general proposition has no application here.

The government cites *Virginia v. Moore*, 553 U.S. 164 (2008). Opening Brief at 28, 30-31. There, the state police arrested a suspect for a minor offense; the police conducted a search incident to arrest and found contraband. The defendant moved to suppress and argued that under state law, the police shouldn't have arrested him and should've simply cited him. The Supreme Court rejected the suppression argument. If the police have probable cause to arrest, an arrest is reasonable under the Fourth Amendment, even if state law imposes additional restrictions on the power to arrest. "[W]hile States are free

46

to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176; *see also Edgerly v. San Francisco*, 599 F.3d 946, 956 (9th Cir. 2010) (following *Moore* in a similar case).

*Moore* isn't on point. The issue in *Moore* was whether a state arrest based on probable cause for a state offense was reasonable under federal constitutional law, even though under state law the officer should've simply cited the suspect. That has nothing to do with the issue here, where a state official seizes a car and seeks a state search warrant for a state offense, and only after the fact does the government attempt to justify the seizure based on a purported federal offense.

The other cases the government cites are similarly irrelevant. Opening Brief at 28, 30-32. Under the Fourth Amendment, the state police can search garbage at the curb without a warrant for evidence of a state crime, even if state law bars the practice. *See California v. Greenwood*, 486 U.S. 35, 43-44 (1988). Under the Fourth Amendment, the state police can impound a car, store it pending a state forfeiture proceeding, and search it without a warrant, even if state law doesn't expressly authorize the search. *See Cooper v. California*, 386 U.S. 58,

60-62 (1967).  Under the Fourth Amendment, the government can introduce evidence in federal court even if the evidence would be inadmissible in state court under a broader state exclusionary rule.  *See United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987) (involving restrictions on obtaining financial records).  Under the Fourth Amendment, tribal authorities can detain a motorist for trespassing even if tribal law precludes the stop.  *See United States v. Becerra-Garcia*, 397 F.3d 1167, 1174 (9th Cir. 2005).  These general principles have little to do with the search-and-seizure issue in this case.[10]

In sum, under *U.S. Currency*, the police cannot seize a car and seek a search warrant to investigate a state crime, then attempt to justify the search and seizure by retrospectively invoking a federal

---

[10] *See also, e.g.*, *Elkins v. United States*, 364 U.S. 206, 224 (1960) (stating generally that Fourth Amendment questions are federal questions); *United States v. Borbst*, 558 F.3d 982, 989-91, 997 (9th Cir. 2009) (declining to explain the defendant's specific state-law arguments); *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000) (involving state law rules regarding consent); *United States v. Castro*, 874 F.2d 817, 1989 WL 42903, at *5 (9th Cir. 1989) (unpublished) (rejecting, in two sentences, the defendant's argument under state law).

crime. This type of seizure is unreasonable as a matter of federal

constitutional law. The government fails to establish otherwise.

## B. The police had no basis to conclude Mr. Steinman was possessing a gun in violation of state law.

The seizure of Mr. Steinman's car was permissible only if the

police had probable cause to believe Mr. Steinman was violating the

state law ban on prohibited persons possessing firearms. There was no

such probable cause, so the seizure was unconstitutional.

The government insists there was probable cause to believe

Mr. Steinman had a firearm simply because he apparently had

ammunition. Opening Brief at 35. But an individual can have

ammunition without having a gun. 2-ER-51. And "probable cause to

believe that *some* incriminating evidence will be present at a particular

place does not necessarily mean there is probable cause to believe that

there will be more of the same." *United States v. Weber*, 923 F.2d 1338,

1344 (9th Cir. 1990). For example, if the police see a suspect commit a

crime with a particular gun, the police might have probable cause to

search the suspect's house for that specific gun. *See United States v.

Nora*, 765 F.3d 1049, 1058-59 (9th Cir. 2014). "But without more," the

suspect's possession of one gun wouldn't give the police "reasonable grounds to believe that any additional firearms would be found in the house." *Id.* at 1059. Likewise, "without more," Mr. Steinman's possession of ammunition didn't provide "reasonable grounds to believe that any . . . firearms would be found in" his car. *Id.*

Mr. Steinman relied heavily on *Nora* in the district court briefing. *See, e.g.*, 3-ER-194. The government's opening brief neglects to cite (much less discuss) the case. Instead, the government relies on a series of other cases, each of which provides minimal if any support for its probable cause argument. Opening Brief at 35-36.

In *United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992), the police stopped a car and saw the passenger bend forward as if to conceal something. The police frisked the passenger and found an empty shoulder holster under the passenger's jacket. The police asked where the gun was, and the passenger said he didn't have one. The Court concluded there was probable cause to search the car for a gun. *Id.* at 746. That conclusion has little bearing here. It's implausible someone would be wearing a shoulder holster without having a gun. But it's

perfectly plausible someone moving from Washington to Utah would have ammunition but not a gun.

In *United States v. Baker*, 850 F.2d 1365 (9th Cir. 1988), the police stopped a car and patted down the defendant; the officer seized a hunting knife, a switchblade, and two ammunition magazines for an Uzi-type firearm. *Id.* at 1367. The officer went into the car to look for the driver's registration and VIN and saw additional weapons. *Id.* The defendant argued the officer had no basis to enter the car. The Court rejected the argument; it explained the officer found multiple rounds of ammunition on the defendant's person, so the officer had probable cause to believe there would be guns in the car. *Id.* at 1369. That case again has little bearing here. In *Baker*, the defendant had two knives and two Uzi magazines on his person; there's no evidence Mr. Steinman had anything of the sort on his person. It's unlikely someone would have ammunition in their pocket if they weren't carrying a gun nearby; by contrast, it's not suspicious if someone is moving from one state to

another state and claims to be taking ammunition (but not guns).[11] *See* 1-ER-10-11.

Aside from the ammunition itself, the government identifies little evidence supporting probable cause. It asserts Mr. Steinman made a "suspicious movement when [Trooper] Boyer approached the car." Opening Brief at 35. The video doesn't support that contention. *See* Dashcam Video at 1:02-1:34 (showing minor, non-excessive movements). Notably, Mr. Steinman had his identification ready when the trooper arrived. Bodycam Video at 3:51:50. Any movements he made can be explained by him grabbing his license (or looking back toward the trooper or his patrol car).

The government relies on Mr. Steinman's "nervous demeanor." Opening Brief at 35. But "nervousness by itself does not establish

---

[11] The two unpublished cases the government relies on are likewise unpersuasive. *See United States v. Gray*, 772 F. App'x 565, 566-67 (9th Cir. 2019) (explaining the officer smelled burnt cannabis, so the officer had probable cause to believe the defendant illegally smoked cannabis in a moving car); *United States v. Horn*, 234 F. App'x 466, 467 (9th Cir. 2007) (explaining the officer knew the defendant personally and had arrested the defendant on weapons and drug charges in the past; the officer saw the defendant hide something under his right leg; and the officer saw a baggy that he believed contained bullets).

probable cause." *Ewing*, 638 F.3d at 1232.[12]  In any event, there's little

indication Mr. Steinman was particularly nervous.  His demeanor

throughout the bodycam video is pleasant.  The trooper himself

acknowledged Mr. Steinman was being "cooperative" (Bodycam Video at

4:08:22, 4:08:25) and "very compliant" (3-ER-368).  And as the district

court permissibly concluded, there was "nothing outside the norm of his

behavior."  1-ER-10; *see also* 1-ER-12 ("[S]ome degree of nervousness . . .

carr[ies] little weight because encounters with police officers are

necessarily stressful.").  The government fails to explain why

Mr. Steinman can be characterized as suspiciously nervous, much less

why the district court's contrary finding on nervousness would be

clearly erroneous.

The government references Mr. Steinman's "prior felony

convictions" as a relevant factor.  Opening Brief at 35.  Those

---

[12] *See also, e.g.*, *United States v. Bowman*, 884 F.3d 200, 214 (4th
Cir. 2018) ("[A] driver's nervousness is not a particularly good indicator
of criminal activity, because most everyone is nervous when interacting
with the police.") (cleaned up); *United States v. Moore*, 795 F.3d 1224,
1230 (10th Cir. 2015) ("[N]ervousness is not entitled to significant
weight when determining whether reasonable suspicion exists.")
(cleaned up).

convictions may have been relevant to whether Mr. Steinman could *lawfully* possess a gun, but they weren't particularly relevant to the question whether Mr. Steinman was *likely* possessing a gun.

The government stresses that because Mr. Steinman was allegedly violating federal law by possessing ammunition, it's more likely he was committing other crimes as well (like possessing a firearm in violation of state law). Opening Brief at 37. The logic is illusive. The lawful or unlawful nature of his ammunition possession sheds no light on whether he was likely possessing a gun as well.

The government mentions Mr. Steinman's statement, midway into the stop, that the ammunition box was empty. Opening Brief at 27, 37. The government says this statement was an "immediate lie[]" that supports probable cause. *Id.* at 27. But it's not clear whether the statement was a lie. Although Mr. Steinman told Trooper Boyer at the start of the stop that he had ammunition, he didn't expressly say there was ammunition in the specific box the trooper saw. Thus, it wasn't inconsistent for Mr. Steinman to say the ammunition box was empty. And the government fails to demonstrate this specific ammunition box was in fact full. In any event, Mr. Steinman made this statement in

54

apparent and understandable frustration. For nearly 30 minutes, the trooper had adopted a friendly demeanor; then, out of nowhere, the trooper confronted Mr. Steinman about his suspicions and requested consent to search. Bodycam Video at 4:19:53-4:20:42. Mr. Steinman responded to this turn of events by expressing irritation. *Id.* at 4:20:47-4:21:03. Even if his expression of frustration included a minor untrue utterance, that statement adds little weight to the probable cause analysis.

As the district court astutely observed, "what we're left with here is that there was a box of ammunition . . . in the vehicle of an individual who's clearly moving." 1-ER-10. "The seizure of [Mr. Steinman's] vehicle was based on [the trooper's] hunch that because [Mr. Steinman] had ammunition and was nervous and a felon, he would also have a gun." 1-ER-14. This type of "mere hunch" cannot satisfy the probable cause test. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (cleaned up). The district court properly ordered suppression.

## III. The search warrant was overbroad.

Assuming there was no prolongation, and assuming Trooper Boyer had probable cause to seize Mr. Steinman's car, the district court

properly suppressed the evidence from the car for a third independent reason: the warrant unreasonably provided permission to seize a wide swath of items with no plausible relationship to the investigation. The government has waived or forfeited any counterargument.

## A.    Standard of review.

The Court reviews a district court's ruling on an overbreadth argument "de novo" and reviews the district court's associated "findings of fact for clear error." *United States v. Flores*, 802 F.3d 1028, 1042 (9th Cir. 2015).

## B.    The warrant gave permission to seize multiple irrelevant items.

The district court correctly concluded "the search warrant was impermissibly overbroad in violation of constitutional safeguards." 1-ER-15.

A warrant cannot authorize the police to seize items unless the application demonstrates probable cause for those items. In other words, "the scope of the warrant"—i.e., the list of items to be seized—must be "limited by the probable cause on which the warrant is based." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir.

2009); *see also, e.g.*, *Weber*, 923 F.2d at 1346 (similar); *VonderAhe v. Howland*, 508 F.2d 364, 369 (9th Cir. 1974). "This requirement prevents general, exploratory searches and indiscriminate rummaging through a person's belongings." *United States v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 466-67 (1971).

In assessing an overbreadth challenge, courts consider "whether probable cause existed to seize all items of a category described in the warrant"; "whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not"; and "whether the government could have described the items more particularly in light of the information available." *Flores*, 802 F.3d at 1044.

Here, Trooper Boyer's search warrant application asserts the investigation involved the suspected crime of "prohibited person possessing firearms." 3-ER-345. But the warrant gave the police permission to seize not just "illicit firearms" but also "stolen property, controlled substances, [and] paraphernalia." 3-ER-351. There's no plausible argument the warrant application demonstrated probable

cause for those items.  Indeed, the government expressly waived any

such argument below.  3-ER-228 n. 6; *see also* 1-ER-16 (noting the

concession).

Because the warrant authorized the police to seize all these items,

the warrant was overbroad.  Each of the three relevant factors supports

this conclusion.  First, there was no "probable cause . . . to seize all

items of [multiple] categor[ies] described in the warrant"—there was no

probable cause to seize stolen property, controlled substances, or

paraphernalia.  *Flores*, 802 F.3d at 1044.  Second, the warrant failed to

"set forth objective standards by which executing officers could

differentiate items subject to seizure from those which were not."  *Id.*

That's especially true for the category of stolen property:  when a

warrant provides "[n]o means of distinguishing between stolen property

and property that is not stolen," the category essentially amounts to a

"general search."  *United States v. LeBron*, 729 F.2d 533, 537 (8th Cir.

1984); *see also* 1-ER-16 (similar).  Third, "the government could have

described the items more particularly in light of the information

available"—the warrant could've simply sought authorization to seize

firearms, not firearms plus the other overbroad categories. *Flores*, 802 F.3d at 1044. The warrant is overbroad from every perspective.

The district court correctly determined wholesale suppression was an appropriate remedy for this vastly overbroad warrant. If a warrant is overbroad in limited respects, a court might suppress items seized under the overbroad provisions but admit evidence seized under appropriately tailored provisions. But if "the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search," wholesale suppression may be appropriate. *SDI Future Health*, 568 F.3d at 707 (cleaned up); *see also, e.g.*, *United States v. Spilotro*, 800 F.2d 959, 968 (9th Cir. 1986) (declining to apply severance).

Even if the authorization to search for firearms was valid, that category was "a relatively insignificant part of" the warrant. *SDI Future Health*, 568 F.3d at 707; *see also* 1-ER-17. The other categories in the warrant predominate. The warrant application includes a lengthy and irrelevant discussion of narcotics investigations. 3-ER-345-46, 349. And the warrant authorizes the seizure of multiple invalid categories—including "stolen property," a category that essentially

59

authorizes a general search. 3-ER-351. The district court therefore correctly ordered wholesale suppression.

Even if the overbroad portions of the warrant could be severed, that would have little effect on the case. The government has refrained from charging Mr. Steinman with any crimes related to firearm possession. Rather, the government has charged Mr. Steinman only with possessing ammunition and alleged silencers. Even if the Court mandates severance, and even if the government may therefore introduce into evidence the seized firearms, those seized firearms have only marginal relevance to the actual charged crimes. The key evidence in this case—the ammunition and alleged silencers—is inadmissible even if the government gets the benefit of severance.

## C. The government has waived or forfeited any counterargument.

The district court made abundantly "clear" it was ordering suppression on "multiple independent grounds," including the warrant's overbreadth. 1-ER-17. But the government's opening brief fails whatsoever to address the overbreadth issue. The government has therefore waived or forfeited any argument on this front.

This Court "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 738 (9th Cir. 1986). There are certain exceptions to this general rule. The Court can reach an unbriefed issue "for good cause shown or if a failure to do so would result in manifest injustice." *Sharemaster v. SEC*, 847 F.3d 1059, 1070 (9th Cir. 2017) (cleaned up). The Court has "discretion to review an issue not raised by appellant . . . when it is raised in appellee's brief." *In re Riverside-Linden Inv. Co.*, 945 F.2d 320, 324 (9th Cir. 1991). And the Court can "review an issue if the failure to raise the issue properly did not prejudice the defense of the opposing party." *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992).

The Court should decline to exercise its discretion to reach the waived overbreadth issue. Mr. Steinman is unaware of any plausible argument that the government has good cause for failing to brief the issue, or that enforcement of the waiver would be manifestly unjust. While Mr. Steinman is addressing the issue in his answering brief, he's obliged to do so to avoid a waiver or forfeiture on his end. *See United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) (en banc)

61

("Generally, an appellee waives any argument it fails to raise in its answering brief."). Mr. Steinman's efforts to preserve the waiver shouldn't in turn excuse the waiver. Finally, Mr. Steinman will face prejudice if the government is allowed to address the issue for the first time in its reply brief, because Mr. Steinman cannot be expected in his answering brief to predict and respond to any arguments the government might present next. The Court should hold the government to its litigation position and decline to reach this issue.

The decision in *Loher v. Thomas*, 825 F.3d 1103 (9th Cir. 2016), is instructive. In that post-conviction case, the district court granted relief to the petitioner on three separate grounds. But "in its opening brief, the State did not argue at all that the district court's grant of relief [on one of the three grounds] should be reversed." *Id.* at 1120. The Court elected to enforce the waiver. *Id.* at 1121. It stressed that "appellate courts do not sit as self-directed boards of legal inquiry and research" but must instead resolve "legal questions presented and argued by the parties before them." *Id.* at 1119 (cleaned up).

So too here. The district court granted suppression on three independent grounds. In its opening brief, the government challenged

two of those grounds, but it failed to present any argument on the overbreadth ruling. As in *Loher*, the Court should enforce the government's waiver. A contrary decision would unduly infringe on the party presentation principle by rescuing the government from its own strategic briefing choices. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020).

Because the warrant was overbroad, and because the government has waived or forfeited any counterargument, the Court should affirm.

## Conclusion

The Court should affirm the district court's suppression ruling and remand for further proceedings.[13]


Dated: July 3, 2024.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jeremy C. Baron*
Jeremy C. Baron
Assistant Federal Public Defender

---

[13] In the proceedings below, Mr. Steinman filed a motion raising a Second Amendment challenge to the ammunition possession count. The district court denied the motion. Mr. Steinman maintains both underlying charged crimes are unconstitutional under the Second Amendment as applied to him. *See United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-1703

I am the attorney or self-represented party.

**This brief contains** 11,200 **words,** including 368 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jeremy C. Baron **Date** July 3, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-1703

The undersigned attorney or self-represented party states the following:

( • )  I am unaware of any related cases currently pending in this court.

( )  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( )  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Jeremy C. Baron     **Date** | Jul 3, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**     *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-1703

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Triston Harris Steinman
> 3009 E. Banded Hills Dr.
> St. George, UT 84790

**Description of Document(s)** *(required for all documents)*:

> Answering Brief

**Signature** | s/ Jeremy C. Baron     **Date** | Jul 3, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

# APPENDIX



Trooper Boyer pulls over Mr. Steinman.

3:51

3:51-3:53 — The trooper approaches the car; he asks whether there are guns or ammo in the car.

The trooper returns to the patrol car and back to Mr. Steinman's car.

3:53-3:56

3:57-3:58 — The trooper orders Mr. Steinman into the patrol car.

Mr. Steinman shows the trooper his insurance information.

3:59

3:59-4:02 — The trooper asks Mr. Steinman a series of detailed questions.

The trooper requests a criminal history check from dispatch.

4:02

4:02-4:05 — The trooper continues asking Mr. Steinman a series of detailed questions.

The trooper receives the initial criminal history check.

4:05

4:05-4:08 — The trooper reviews the initial criminal history check.

The trooper continues asking Mr. Steinman a series of detailed questions.

4:09-4:19

4:19-4:20 — Sergeant Marin arrives; Mr. Steinman declines consent to search.



The trooper and the sergeant discuss the situation.

4:21-4:23

The trooper gets in his patrol car and calls someone who doesn't pick up.

4:24

The trooper calls someone and unsuccessfully requests a drug dog.

4:25

The trooper asks dispatch to verify whether Mr. Steinman has prior felony convictions.

4:26

The trooper calls someone who doesn't pick up.

4:28

The trooper gets a call from dispatch confirming at least one prior felony conviction.

4:28-4:30

The trooper calls the lay justice of the peace on duty and asks about a search warrant application.

4:31-4:34

The trooper calls someone who doesn't pick up.

4:35

The trooper tells the sergeant the justice of the peace said to submit a warrant application.

4:36

The trooper prints the citation.

4:37

The trooper explains the citation to Mr. Steinman and says the car is seized.

4:38-4:40

The trooper calls someone to discuss the situation.

4:47-4:55



The trooper discusses the situation with the sergeant.

4:57-5:02

The trooper and the sergeant discuss whether to return Mr. Steinman's documentation.

5:02-5:04

The trooper asks the sergeant for Mr. Steinman's registration again.

5:05

The trooper discusses the situation with someone over the phone.

5:05-5:11

The trooper hands Mr. Steinman's registration back to the sergeant.

5:12

The trooper discusses the situation with someone over the phone.

5:14-5:17

The sergeant explains Mr. Steinman wants to leave and wants his identification back.

5:22-5:25

Mr. Steinman receives his identification and leaves on foot.

5:25